IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


BRUCE LEICHTY,

       Plaintiff,

v.                                          Case No. 19-1064-JWB

BETHEL COLLEGE;
MENNONITE CHURCH USA;
CITY OF NORTH NEWTON, KANSAS;
JOHN THIESEN;[1] and
JOEL NAFZIGER,

       Defendants.


**MEMORANDUM AND ORDER**

      This matter is before the court on Defendants' motions to dismiss (Docs. 24, 29, 34, 39) and Plaintiff's motion to take judicial notice (Doc. 47). The motions have been fully briefed and are ripe for decision. (Docs. 25, 30, 35, 40, 46, 48, 49, 55, 58, 59, 60, 61, 62.) For the reasons set forth herein, the City of North Newton's Motion to Dismiss (Doc. 24) is GRANTED; Bethel College and John Thiesen's Motion to Dismiss (Doc. 29) is GRANTED IN PART and DENIED IN PART; Mennonite Church, USA's Motion to Dismiss (Doc. 34) is GRANTED; Joel Nofziger's Motion to Dismiss (Doc. 39) is GRANTED; and Plaintiff's Motion for Order (Doc. 47) to take judicial notice is DENIED.

---

[1] The last name of this Defendant was spelled "Thiessen" in the complaint but the parties now recognize the correct spelling is "Thiesen." (Doc. 30 at 1; Doc. 48 at 1.)

## I. Facts

The following allegations are taken from Plaintiff's pro se complaint.[2]  (Doc. 1.)  Plaintiff is a resident of California and is a licensed attorney in California.  In the weeks prior to March 16, 2018, Plaintiff registered for a conference titled "Mennonites and the Holocaust" sponsored by Bethel College ("Bethel") and Mennonite Church USA ("MCUSA").  (The complaint refers to Bethel and MCUSA collectively as "Sponsors." (*Id.* at 5.))  The conference was to be held on the Bethel campus in North Newton, Kansas, on March 16-17, 2018.  Plaintiff was a member of a congregation affiliated with MCUSA.  (*Id.* at 4-5.) Plaintiff's registration and registration fee of $100 were accepted and he was issued a badge and conference materials by the Sponsors.  Plaintiff alleges he was thus made a licensee who was allowed to participate in the conference and to be present on campus for the duration of the conference.  (*Id.* at 5.)  Alternatively, he alleges this exchange constituted a binding contract.  (*Id.* at 6.)

Plaintiff invited two individuals of Jewish origin or identity to take part in in the conference with him as registrants and, "on the side," to make their own presentation titled "Two Jewish Revisionists Consider the Holocaust." (*Id.* at 9.)  Plaintiff's two guests did not pre-register for the conference. Upon the guests' arrival at the conference on March 16, the Sponsors denied a request to register them despite their willingness to pay and to forego any conference meals, and despite ample space in the lecture hall where presentations were given.  The representative who denied the request, Mark Jantzen, agreed the issue could be revisited the following day in view of the fact

---

[2] Plaintiff has filed a motion to take judicial notice of three additional facts.  (Doc. 47.)  The federal rules allow a court to take judicial notice of facts that can be accurately and readily determined "from sources whose accuracy cannot reasonable be questioned."  Fed. R. Evid. 201(b)(2).  The facts asserted by Plaintiff, which include allegations from unspecified sources in "on-line search[es]," do not satisfy Rule 201.  Plaintiff's motion (Doc. 47) is accordingly denied.

the two individuals had traveled from (respectively) New York and Michigan. Plaintiff's guests were excluded from some conference events on March 16, although they attended certain sessions open to the public. (*Id.* at 9.)

The Sponsors prevented Plaintiff from handing out flyers, pamphlets, or books in the foyer outside the lecture hall where the conference sessions were to be held. The flyers contained information about the off-campus presentation by Plaintiff's guests. No rules had previously been given to registrants prohibiting the distribution of materials to other registrants. When Plaintiff was confronted by the Sponsors about distributing flyers, he "politely asserted what he regarded as his rights as a Conference registrant on a college campus." (*Id.*at 10.) He was thereupon "threatened with arrest, and a law enforcement officer from the City of North Newton was called to the scene…." (*Id.*) Plaintiff consented to refrain from distributing materials in exchange for his ability to remain at the conference. Plaintiff missed the opening remarks of the conference while this occurred. During those remarks, a Sponsor representative, John Thiesen, allegedly told registrants that a "Holocaust denier" (referring to Plaintiff) was present who might disrupt the conference. (*Id.* at 11.)

Plaintiff alleges he is "not a 'Holocaust denier,'" although he has "identified himself with revisionist views on the Holocaust…." (*Id.*) He has never claimed "that the pejorative label 'Holocaust denier' accurately describes him or that it accounts for the complexity or nuances of his historical views…." (*Id.*) Plaintiff considers the term a slur "since it implies both that there is incontrovertible evidence for the extermination by German authorities of six million noncombatant Jews (and others) during World War II and that Plaintiff is minimizing the suffering and death of those victims of war." (*Id.* at 12.)

Plaintiff attended the remainder of the morning sessions without incident. At the last session in the afternoon, at a panel on "Mennonite Attitudes Toward the Holocaust," Plaintiff stood up and asked for a microphone as a question and answer session was drawing to a close. Plaintiff was given a microphone and was reminded to "keep his comments on point." (*Id.* at 13.) Plaintiff said that, "just as there are different Mennonite attitudes toward the Holocaust, there are also different Jewish attitudes toward the Holocaust," and began announcing that registrants could hear a revisionist Jewish perspective on the Holocaust at a nearby location that evening. (*Id.*) Jantzen, the session moderator, angrily interrupted and called for Plaintiff's microphone to be cut off. Jantzen then "charged up the aisle" and called the police on his mobile phone. Plaintiff's microphone was cut off and he completed his announcement amidst shouts and jeers. Jantzen announced that the session had ended. (*Id.* at 12-13.)

With the session ended, Plaintiff began to leave the room. He was approached by a representative of MCUSA, John Sharp. He and Sharp agreed to meet at lunch the next day to discuss Plaintiff's agenda and concerns. (*Id.* at 13.)

As Plaintiff was exiting the parking lot, he "had an amicable exchange" with North Newton Police Chief Randy Jordan as Jordan drove into the lot. (*Id.* at 14.) Both individuals were in their vehicles with the windows rolled down. Plaintiff told Jordan he was leaving the campus and was on his way to set up the community room in North Newton, adjacent to the police station, for the event he would be moderating that evening. Jordan was aware of the event. Plaintiff alleges that at no time on March 16 was he ordered not to return to campus or told his license to be present on campus for the conference was terminated. (*Id.*)

Plaintiff and his guests thereafter conversed with Chief Jordan at the North Newton community room. After Plaintiff moderated a presentation by his two guests at the community

room, Plaintiff and one of his guests returned to the campus for the conference's evening event, which was a film open to the public. After the event, Plaintiff spoke with Jantzen about whether the Sponsors would allow his guests to register for and attend the session the next day. Jantzen allegedly said, "Not only will they not be allowed to register, you are also out of the conference." (*Id.* at 14-15.) Plaintiff told Jantzen that he (Plaintiff) was a paid registrant and had a right to attend the conference.

Plaintiff alleges that at no time did Jantzen or anyone else tell him he was ordered not to return to campus or specify that he "was being prohibited from returning to the campus as distinguished from the Conference." (*Id.* at 16.) He also alleges that at no time did Jantzen or anyone else revoke "the invitation to Plaintiff from Sponsors' representative John Sharp" to meet for lunch on March 17. (*Id.*)

The next morning, March 17, 2018, Plaintiff went to the North Newton police station "to seek clarification of his prospective status." (*Id.* at 16-17.) He told the officer on duty, Officer Stovall, what had happened and sought assurance that he would not be arrested if he attempted to assert his right to remain at the conference. Stovall told him that if college officials called the police, Plaintiff would not be arrested at that point, but if the officials ordered him off campus, he would be given the opportunity to leave upon penalty of arrest if he returned. (*Id.* at 17.)

Stovall was called by the Sponsors later that morning "to execute an arrest of Plaintiff." (*Id.* at 18.) On campus, Stovall "accused Plaintiff of not giving him all the facts and stated that he now found out that Plaintiff had already been 'trespassed' the previous day…." (*Id.*) Stovall did not contact Chief Jordan to determine whether he knew if Plaintiff had been ordered not to return to campus. Stovall arrested Plaintiff. (*Id.*) Plaintiff was hand-cuffed with his hands behind his back and placed in a patrol car. Plaintiff alleges the Sponsors or their representatives "gave false

testimony and defamatory information" to Stovall prior to the arrest, "namely that Plaintiff had appeared on campus that morning in defiance of a prior warning issued to him on March 16 that he would be trespassing if he did." (*Id.* at 19.)

As a consequence of his arrest, Plaintiff was detained in a holding cell at the Harvey County Detention Center for 18 hours. He was fingerprinted and photographed. After his release, Plaintiff allegedly confirmed with Chief Jordan that Jordan "had not 'trespassed'" him on March 16 and that Jordan was not aware of any trespass warning by Bethel on that date. (*Id.* at 20.) On April 19, 2018, Plaintiff was informed by a City of North Newton prosecutor that he would not be prosecuted for any offense. (*Id.*) Plaintiff rejected and refused to endorse a $100 check sent to him by Bethel after the conference. (*Id.* at 21.)

After the conference, statements about Plaintiff appeared on the worldwide web on a website of the Anabaptist Historians, operated by Joel Nofziger with the sponsorship of the Lancaster Mennonite Historical Society ("LMHS"). (Doc. 1 at 12.) Nofziger had been present at the conference. Nofziger and LMHS published on the website "the following false and defamatory statements of one Lisa Schirch" that: "A Mennonite Holocaust denier, Bruce Leichty, attended parts of the conference"; "Leichty has passed out anti-Semitic literature at Mennonite Church USA gatherings"; and "When Leichty began to ask an offensive question during the conference, the organizers removed him by calling campus security…." (*Id.*) Nofziger refused Plaintiff's demand that he be allowed equal space on the website to rebut the statements, and thereby allegedly adopted the statements of Schirch as his own. (*Id.* at 22.)

Plaintiff asserts claims against one or more Defendants for the following: breach of contract, false arrest, false imprisonment, defamation, infliction of emotional distress, and a claim under 42 U.S.C. § 1983 for deprivation of civil rights.

## II. Motion to Dismiss Standard

In order to withstand a motion to dismiss for failure to state a claim, a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007)). All well-pleaded facts and the reasonable inferences derived from those facts are viewed in the light most favorable to Plaintiff. *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008). Conclusory allegations, however, have no bearing upon the court's consideration. *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007). Rule 12(b)(6) "does not require that Plaintiff establish a prima facie case in her complaint, but rather requires only that the Plaintiff allege enough factual allegations in the complaint to set forth a plausible claim." *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1171–72 (10th Cir. 2015) (internal citations omitted). In the end, the issue is not whether Plaintiff will ultimately prevail, but whether Plaintiff is entitled to offer evidence to support his claims. *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005).

## III. Analysis

### 1. <u>City of North Newton Motion to Dismiss</u> (Doc. 24.)

The complaint asserts a tort claim against North Newton for false arrest and false imprisonment under Kansas law (Count 4), and a claim for deprivation of civil rights under 42 U.S.C. § 1983 (Count 10).

**a. Count 4 – false arrest and imprisonment**. North Newton moves to dismiss this claim based on Plaintiff's failure to satisfy the notice-of-claim requirements of K.S.A. 12-105b. (Doc. 25 at 4.) Plaintiff admits he did not submit a notice of his claim with North Newton before filing suit and has not satisfied the requirements of 12-105b. (Doc. 46 at 7-8.) Nevertheless, he submitted

a notice of claim on July 17, 2019, and argues "the error is or should be non-fatal." (Doc. 46 at 6.) Plaintiff asserts "that nothing in federal law supports or requires dismissal of his claim under the Kansas Tort Claims Act for his error." (*Id.* at 8.)

The court finds Count 4 must be dismissed based on Plaintiff's failure to satisfy K.S.A. 12-105b. Section 12-105(d) provides in part that any person having a claim against a municipality which could give rise to a claim under the Kansas Tort Claims Act (KTCA) must file the notice required by that section before commencing an action in court. Once the notice is filed, "no action shall be commenced until after the claimant has received notice from the municipality that it has denied the claim or until after 120 days has passed following the filing of the notice of claim, whichever occurs first." *Id.* Plaintiff's response effectively concedes his claim is subject to the KTCA[3] and that North Newton has not yet administratively denied the notice he filed on July 17, 2019. (Doc. 46 at 7-8.) Nor has 120 days passed from the filing of his notice. In such circumstances, section 12-105b(d) provides that "no action shall be commenced…."

Plaintiff argues dismissal of his claim is "draconian" and that the failure to comply with K.S.A. 12-105b "is not a jurisdictional failure as might be the case if he were litigating in state court." (Doc. 46 at 8.) He argues that *Lincoln v. BNSF Rwy. Co.*, 900 F.3d 1166 (10th Cir. 2018), which held a failure to exhaust administrative remedies on a Title VII claim did not deprive a federal district court of subject matter jurisdiction, should be applied with respect to K.S.A. 12-105b. This argument is untenable. Count 4 alleges a false arrest and false imprisonment claim under Kansas common law; it is not governed by federal exhaustion rules. "[W]hen a federal court

---

[3] The complaint alleged that the KTCA was inapplicable because Plaintiff was asserting an intentional tort (Doc. 1 at 3), but Plaintiff now concedes he has no authority for that argument, and he no longer asserts it. (Doc. 46 at 7-8.) *Cf. Garcia v. Anderson*, 46 Kan. App. 2d 1094, 1100, 268 P.3d 1248, 1252 (2012) (claims for assault, battery, and false imprisonment are subject to 12-105b notice requirement if they were committed by municipal employees acting within the scope of their employment.)

exercises diversity or pendent jurisdiction over state-law claims, 'the outcome of the litigation in federal court should be substantially the same, so far as legal rules determine the outcome of the litigation, as it would be if tried in a State court.'" *Felder v. Casey*, 487 U.S. 131, 151 (1988) (citation omitted.)  Accordingly, federal courts entertaining state law claims are obligated to apply state notice-of-claim provisions. *Id.*  The claim in Count 4 is governed by Kansas law, which requires dismissal of the claim for failure to satisfy section 12-105b.  *See Whaley v. Sharp*, 301 Kan. 192, 197, 343 P.3d 63, 67 (2014) ("Compliance with … 12-105b(d) is required before a court has subject matter jurisdiction over a tort claim against a municipality."); *Lara v. Unif. Sch. Dist. No. 501*, 350 F. App'x 280, 284-85 (10th Cir. 2009) (compliance with 12-105b is mandatory; affirming dismissal of complaint for failure to satisfy that provision.)

**b. Count 10 - violation of civil rights under section 1983.**  Count 10 alleges that North Newton is liable under § 1983 because the city deprived Plaintiff of "his constitutionally guaranteed right of liberty" by subjecting him to false arrest and false imprisonment, under color of state law, on March 17, 2018.  (Doc. 1 at 41.)  North Newton argues this count fails to state a valid claim for relief under § 1983 because it does not allege that any municipal policy or custom was the moving force behind the violation.  (Doc. 25 at 8.)

Section 1983 provides a remedy against any person who, acting under color of state law, deprives an individual of a right secured by the Constitution and laws of the United States.  42 U.S.C. § 1983. But a local government "may not be sued under § 1983 for an injury inflicted solely by its employees or agent." *Waller v. City and Cty. of Denver*, ___F.3d___, 2019 WL 3543115, *3 (10th Cir. Aug. 5, 2019) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "[I]n other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* (quoting *Monell,* 436 U.S. at 691).  Rather, the government may only be held liable

"when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* (quoting *Monell*, 436 U.S. at 694.)

Accordingly, to establish municipal liability, a plaintiff must first demonstrate a municipal policy or custom, which may take one of the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* (quoting *Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010)).

After demonstrating a municipal policy or custom, a plaintiff must also demonstrate "a direct causal link between the policy or custom and the injury alleged." *Waller*, 2019 WL 3543115, at *4 (quoting *Bryson*, 627 F.3d at 788). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)). "The causation element is applied with special rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Id.* (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 777 (10th Cir. 2013)). On claims of inadequate hiring, training, or supervision, a plaintiff must also "demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* (quoting *Brown*, 520 U.S. at 407.)

Plaintiff's complaint fails to identify any North Newton policy or custom or allege any facts to show a direct causal link between such a policy and the allegedly wrongful arrest. In response to North Newton's motion, Plaintiff seems to argue that he implicitly identified a policy by describing the circumstances leading to his arrest, including Officer Stovall's alleged statement to Plaintiff that he would be given a chance to leave campus before being arrested if officials ordered him out. Plaintiff now characterizes this as a "trespass arrest policy." (Doc. 46 at 24-25.) The allegation that Officer Stovall made such a statement does not show the existence of a City of North Newton policy or custom, nor does calling such a statement a policy explain how it was the moving force behind Plaintiff's allegedly unlawful arrest. *See Bryson*, 627 F.3d at 788 (listing the various forms a municipal policy or custom may take.) In fact, the complaint indicates Plaintiff's arrest was *contrary to* the asserted "trespass arrest policy," not caused by it. Plaintiff also argues he identified a "policy or custom of crediting the narrative of one of its largest citizens" because he alleged that North Newton "arbitrarily chose to believe the local prominent citizen of its town, Bethel College, and to not credit the narrative of Plaintiff…." (Doc. 46 at 28, Doc. 1 at 30-31.) Plaintiff again fails to allege any facts to show that this was a policy or custom of the City of North Newton.[4] Alternatively, Plaintiff argues he should not be required to plead facts showing a policy or custom because he has not yet had discovery. (*Id*. at 26-27.) But Plaintiff is not entitled to maintain an action against North Newton if he has no knowledge of any facts that could support a claim for relief against the city.

Plaintiff also says if the court finds his pleading inadequate, then he "would like to be able to amend to better plead … [that the] City was acting consistent with a custom of either improper

---

[4] The court does not construe the complaint with the liberality normally afforded to pro se litigants because the complaint alleges that Plaintiff is an attorney licensed in California. Doc. 1 at 7. *See Caranchini v. Hayden*, 2019 WL 2567734, *2 (D. Kan. June 21, 2019) ("The pro se liberality rule … does not extend to pro se plaintiffs who are licensed attorneys.") (citing *McNamara v. Brauchler*, 570 F. App'x 741, 743 (10th Cir. 2014)).

investigation of conflicting narratives or inadequate training regarding what exactly constitutes trespass …, or a custom of unlawfully preferring the allegations of its prominent citizen, Bethel College … or to inadequate training as to how to evaluate and deal with the claims of its largest citizen … [or] failure by official policymakers in North Newton to properly train or supervise subordinates….” (Doc. 46 at 28.)  To the extent such casting about for a viable theory could be construed as a request by Plaintiff for leave to amend the complaint, the court declines to grant it. Aside from the conclusory nature of the foregoing allegations, the local rules require that motions for leave to amend must be accompanied by a concise statement of the amendment sought and a copy of the party’s proposed pleading.  D. Kan. R. 15.1(a).  If Plaintiff is seeking leave to amend his claim against North Newton, he must do so as provided in D. Kan. R. 15.1.  At this point, however, the complaint fails to state any valid claim under § 1983 against North Newton.

**2.  Bethel College and John Thiesen Motion to Dismiss** (Doc. 29.)

a.  **Count 1 – breach of contract/license**.  Defendants Bethel and Thiesen argue that Plaintiff’s conference registration amounted to a license that was revocable at will and that “Plaintiff is not entitled to consequential damages, or any other damage (other than a refund of the admission fee) as a result of the revocation of his license to attend the conference.”  (Doc. 30 at 7.)  They assert that Bethel returned the conference registration fee to Plaintiff such that he suffered no actual damage and has no viable claim for breach of contract.  (*Id.* at 8.)

The court finds Defendants’ motion to dismiss this claim should be denied.  The elements of a claim for breach of contract in Kansas are “(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach.” *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d

1083, 1098 (2013) (citation omitted). Defendants do not deny that a license – assuming they are correct that registration for the conference amounted to a license – constitutes a form of contract. Rather, they challenge the element of damages and whether Plaintiff can recover any damages beyond the $100 refund Bethel offered him. But the court finds no Kansas cases - and Defendants cite none - that preclude recovery of any conceivable damages other than the purchase price of a license. Even in jurisdictions where "a mere license is revocable at any time, so far as further enjoyment of the easement is concerned," courts have held "that in such cases where money has been expended upon the faith of such license, so that the parties cannot not be placed in *statu quo*," recovery of some expenditures made in reliance upon the license may be appropriate, whether in an action for breach of contract or in equity. *Houston v. Laffe*, 46 N.H. 505, 508, 1866 WL 1951, *3 (N.H. 1866). *See also* C.J.S. Licenses in Respect of Real Property § 159 (an estoppel may result where the licensor's consent induces the licensee to make expenditures; a license "cannot be revoked without reimbursing the licensee for the expenditures or otherwise placing the licensee in statu quo."); *Page v. Lydic*, 123 Kan. 122, 254 P. 316 317 (1927) ("where the licensee has acted under the license in good faith, and has incurred expense in the execution of it, by making valuable improvements or otherwise, it is regarded in equity as an executed contract…, the revocation of which would be a fraud on the licensee"); *Kastner v. Benz*, 67 Kan. 486, 73 P. 67 (1903) ("Cases can readily be imagined where the revocation of a license, in reliance upon which the licensee has changed his own situation, might work the gravest fraud, injustice, and injury"). Recovery of expenditures made in direct reliance upon an executed license appears to be consistent with Kansas contract law, which allows contract damages "which may fairly be considered as arising in the usual course of things, from the breach itself, or as may reasonably be assumed to have been within

the contemplation of both parties as the probable result of the breach."[5]  *Enlow v. Sears, Roebuck and Co.*, 249 Kan. 732, 738, 822 P.2d 617, 623 (1991).

Plaintiff alleges he suffered damages from the revocation of the license after his arrival because he expended money for travel and lodging in the reasonable expectation that the license agreement would be fully performed by the Sponsors.  (Doc. 1 at 25.)  These allegations are sufficient to show damages directly associated with the allegedly wrongful revocation of the license.  In view of this finding the court need not address Defendants' additional argument that some of Plaintiff's other claimed damages were not caused by the alleged breach of contract.  (Doc. 30 at 9.) The motion to dismiss Count 1 for failure to state a claim is denied.

**b. Counts 2 and 3 – Intentional and negligent false arrest.**  Bethel argues it cannot be liable for false arrest because the decision to arrest Plaintiff was within the discretion of law enforcement officers.  (Doc. 30 at 11.)  It also argues Kansas does not recognize a claim for negligent false arrest as alleged in Count 3. (*Id.* at 12.)

"False arrest is the restraint of the personal freedom of an individual without legal excuse by any words, acts, threats, or personal violence that under the circumstances the one being restrained fears to disregard." *Soto v. City of Bonner Springs*, 38 Kan. App. 2d 382, 385, 166 P.3d 1056, 1059 (2007) (citing *Mendoza v. Reno Cty.*, 235 Kan. 692, 695, 681 P.2d 676 (1984)).  A person may be liable under Kansas law for causing an unlawful arrest if he "either instigated it, assisted in the arrest, or by some means directed, countenanced or encouraged it."  *Thompson v. Gen. Fin. Co.*, 205 Kan. 76, 88, 468 P.2d 269, 280 (1970).  The Kansas Court of Appeals elaborated on what sort of "instigation" gives rise to liability:

> What is direction or instigation sufficient to impose liability on a private citizen for a wrongful arrest made by an officer, within the rule imposing liability on a citizen

---

[5] Bethel does not argue that its obligation to perform under the license agreement was excused by Plaintiff's conduct. The court accordingly does not address that issue.

at whose request or instigation an arrest is made without a warrant, depends on the facts of each case. It is not necessary, to impose liability, that the defendant expressly direct the arrest. Nor need he be present when the arrest is actually made. However, he must take some active part in bringing the arrest about[,] that is, there must be some affirmative act on his part which induces the officer to make the arrest….

*Thurman v. Cundiff*, 2 Kan. App. 2d 406, 408, 580 P.2d 893, 897 (1978) (quoting 32 Am. Jur.2d *False Imprisonment* § 35).  The mere giving of information to a peace officer tending to show that a crime has been committed is not enough to render the informer liable.  *Id.*  Thus, a person is not liable "where he merely states to a police officer his knowledge of a supposed offense and the officer makes the arrest entirely upon his own judgment and discretion."  *Id.* (citation omitted.)  *See also Restatement (Second) of Torts* § 45A cmt. a ("It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.")

Bethel argues it cannot be liable because the complaint alleges only that Bethel "gave false information to the police" and does not allege that Bethel told law enforcement officers to arrest Plaintiff.  (Doc. 30 at 11.) But as noted in *Thurman*, "[i]t is not necessary … that the defendant expressly direct the arrest," and Kansas courts have recognized claims for false arrest where a complainant provided materially false information that caused an officer to arrest a person. In *Thompson*, for example, a finance company that signed a materially false affidavit in support of a criminal complaint was held liable for having "instigated, assisted and countenanced Thompson's arrest by not making a full and truthful disclosure of the facts to the county attorney." *Thompson*, 205 Kan. at 88, 469 P.2d at 280. In *Thurman*, the court upheld a finding of false arrest based upon evidence that the complaining witness told sheriff's deputies that a person had cut down a fence and entered a private driveway, while failing to disclose that the fence was not actually cut and

that the person entering was a lessee whose only means of accessing the leased property was through the landlord's driveway. *Thurman*, 2 Kan. App. 2d at 409-10, 580 P.2d at 898.

Applying these standards to the complaint, the court finds Plaintiff has alleged sufficient facts to plausibly state a claim for false arrest against Bethel. The complaint alleges that Bethel or its representative "gave false … information about Plaintiff to Officer Stovall … before Plaintiff's arrest on March 17, namely that Plaintiff had appeared on the campus that morning in defiance of a prior warning issued to him on March 16 that he would be trespassing if he did." (Doc. 1 at 19.) It alleges that Plaintiff was falsely arrested "as a direct consequence of the false report…." (*Id.* at 26.) For purposes of the motion to dismiss, the court assumes the truth of these allegations.[6] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.") Thus, the court assumes that Bethel falsely represented to the officer that Plaintiff had been expressly warned on March 16 that he would be trespassing if he returned to campus. The allegation that Bethel instigated the arrest by providing false information about a prior trespass warning is sufficient to state a claim under Kansas law. *See Crutcher v. Coleman*, 2003 WL 21077433, *5 (D. Kan. May 9, 2003) ("If a warrant is based on false information, the resulting arrest may be without legal excuse.") (citing *Thompson*, 205 Kan. at 88, 468 P.2d at 280.)

---

[6] Bethel also argues the false arrest claim fails because "Plaintiff admits that he was told by Mark Jantzen that he was no longer permitted at Bethel College for the conference." (Doc. 30 at 11.) This is a reference to the complaint's allegation that Jantzen stated to Plaintiff he was "out of the conference." But the circumstances surrounding that statement, and whether there was any elaboration of it during this encounter, are not included in the complaint. In response to Jantzen's statement, Plaintiff allegedly "reminded Jantzen that Plaintiff was a previously admitted paid registrant, and that Plaintiff had a right to attend the Conference sessions." (Doc. 1 at 16.) Jantzen's response, if any, is not set out in the complaint, nor are the circumstances under which the encounter concluded. The complaint does allege, however, that at no time did Jantzen order Plaintiff not to return to campus. (*Id.*) It further alleges that Bethel falsely told the arresting officers the next day that Plaintiff had been warned on March 16 "that he would be trespassing" if he returned to campus. (Doc. 1 at 19.) In sum, Bethel's argument relies on facts and inferences that are not alleged in the complaint and which are not considered by the court on a motion to dismiss on the pleadings.

In Count 3, Plaintiff alleges Bethel is also liable for false arrest under a negligence theory because it "owed him a duty of care as a registrant" and acted negligently by "not seeking to ascertain or communicate the true facts," which led to his arrest. (Doc. 1 at 27-28.) While Kansas recognizes that a law enforcement officer's negligent conduct can form the basis of a false arrest claim, Plaintiff cites no Kansas authority for the proposition that a third party can be liable for "negligent investigation" leading to an arrest, or that a conference host owes an attendee a common law duty of care to investigate or convey only "true facts" about the attendee to law enforcement officers. *Cf. Soto v. City of Bonner Springs,* 38 Kan. App. 2d 382, 385, 166 P.3d 1056, 1059 (2007) ("a cause of action which alleges negligent conduct by law enforcement officers which results in false arrest and consequent damages is a cause of action for false arrest and imprisonment."); *Brown v. State*, 261 Kan. 6, 927 P.2d 938 (1996) (false arrest claim arising from officer's negligent conduct was subject to the statute of limitations for intentional torts, not negligence). Because Plaintiff fails to show any such common law duty is recognized by Kansas law, the court grants Bethel's motion to dismiss the false arrest claim asserted in Count 3. *See Lamb v. State*, 33 Kan. App. 2d 843, 847, 109 P.3d 1265, 1268 (2005) (the plaintiff is required to prove the existence of a duty owed to him by the defendant; the existence of a legal duty is a question of law).

**c. Count 5 – defamation**. Count 5 alleges that Bethel defamed Plaintiff by publishing false statements to law enforcement officers "that Plaintiff was trespassing on the property of [Bethel] after having been warned that he did not have the right to return to the property upon penalty of arrest." (Doc. 1 at 33.) Bethel contends Count 5 fails to allege a viable defamation claim because Plaintiff "has not pled special damages sufficient to survive a motion to dismiss." (Doc. 30 at 14.)

In Kansas, the elements of defamation include false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed. *Hall v. Kansas Farm Bureau*, 274 Kan. 263, 276, 50 P.3d 495, 504 (2002). Damage to one's reputation is the essence of an action for defamation. *Gobin v. Globe Publishing Co.*, 232 Kan. 1, 6, 649 P.2d 1239, 1243 (1982.) Kansas cases previously required proof of "special damages" to support a defamation claim, but that term now "means nothing more than actual damages." *Hall*, 274 Kan. at 275, 50 P.3d at 504 (citation omitted.) Actual damages in this context can include "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Id.* (citations omitted.)

Count 5 alleges Plaintiff has suffered "damage to … reputation," "loss of work for Plaintiff as a lawyer," "loss in profitability of his law practice," and "broken relationships including … relatives with whom Plaintiff was once close." (Doc. 1 at 33-34.) Among other things, Bethel challenges whether Plaintiff has alleged that the foregoing damages were caused by the alleged defamatory statements. (Doc. 30 at 15.) Plaintiff alleges he suffered the damages to his reputation "from being defamed *and thereby falsely arrested*," resulting in damages "over and above the damages suffered as a direct result of his false arrest…." (Doc. 1 at 34) (emphasis added.) These allegations are not sufficient to plausibly demonstrate a causal connection between Bethel's allegedly defamatory statements and Plaintiff's claimed damages. As Bethel points out, Plaintiff has alleged that *his arrest* caused damage to his reputation, law practice, and family relationships, not that Bethel's statements to law enforcement officers caused such damages. Plaintiff's additional allegation that he suffered damages from the defamatory statements "over and above" the damages from his arrest is a mere conclusion without any supporting factual basis. *See Iqbal*, 556 U.S. 662, 678 (a pleading that offers labels and conclusions will not do; to survive a motion

to dismiss, a complaint must contain sufficient factual matter to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.) *See also Debord v. Mercy Health Sys. of Kansas, Inc.*, 860 F. Supp. 2d 1263, 1283 (D. Kan. 2012) ("A victim's own observations may be suitable as proof of harm to … reputation for defamation…, but they must raise a reasonable inference that the damage was caused by the [defendant's] statements.") (citing *Moran v. State*, 267 Kan. 583, 985 P.2d 127 (1999)); *Warner v. Schmidt,* 2011 WL 2784492, *2 (M.D. Fla. July 15, 2011) (plaintiff failed to allege any facts to establish that damage to his reputation was attributable to defendant's website post). Because Plaintiff's allegations in Count 5 fail to plausibly support a claim for defamation, Bethel's motion to dismiss this claim will be granted.

**d. Count 6 – defamation claim against Defendant Thiesen and Bethel**. Count 6 alleges that Defendant Thiesen is liable for defamation for calling Plaintiff a "Holocaust denier" at the conference. (Doc. 1 at 34-35.) The complaint alleges Bethel is also liable for the statement because Thiesen was acting on behalf of Bethel. (*Id.* at 35.) Defendants contend Thiesen's alleged statement was a statement of opinion or hyperbole that is not actionable under Kansas law. (Doc. 30 at 15-16.) The court agrees. Under the circumstances alleged, Thiesen's statement does not plausibly support a claim for defamation.

To state an actionable defamation claim, Plaintiff must allege facts showing (among other things) that Thiesen's words were both false and defamatory. *Hall*, 274 Kan. at 276, 50 P.3d at 504. In assessing whether statements are defamatory, "Kansas law distinguishes between fact and opinion statements." *Robinson v. Wichita State Univ.*, No. 16-2138-DDC, 2017 WL 2378332, *4 (D. Kan. May 31, 2017) (citing *Byers v. Snyder*, 44 Kan. App. 2d 380, 397, 237 P.3d 1258, 1271 (2010)). "Statements of personal opinion or hyperbole are not defamatory under Kansas law." *Id.*

But statements amounting to objectively verifiable facts may be actionable. For example, in *Byers* the court found statements "describing the plaintiff as staggering and smelling strongly of alcohol were a 'recounting of objective observations, not opinion and hyperbole,' and thus could be defamatory." *Id.*

The complaint alleges that Plaintiff "never has been and is not a 'Holocaust denier.'" (Doc. 1 at 11.) But it acknowledges that Plaintiff "identified himself with revisionist views on the Holocaust" through the flyer he distributed prior to Thiesen's statement, and that the term "Holocaust denier" does not account "for the complexity or nuances of [Plaintiff's] historical views…." (*Id.* at 11.) It further alleges "Holocaust denier" is a slur in part because it "implies … that there is incontrovertible evidence for the extermination by German authorities of six million noncombatant Jews (and others) during World War II…." (*Id.* at 12.) The only reasonable inference of these allegations is that Plaintiff's "revisionist views" expressed at the conference challenged, at least to some extent, whether it is historical fact that the Nazis murdered approximately six million Jews in World War II. It is a free country, as the saying goes, and Plaintiff is at liberty to hold or express any opinion he wants about the Holocaust. But whether Plaintiff's "revisionist view" could be considered a "denial" or made him a "denier" of a historical event was, under such circumstances, a matter of personal opinion. The complaint indicates Thiesen's characterization was based upon Plaintiff's publicly expressed doubts or challenges to commonly accepted historical accounts of the Holocaust.[7] That is entirely different from labeling someone a "Holocaust denier" who never expressed any opinion about the Holocaust, which might

---

[7] *See e.g.* History.com, https://historycom/topics/world-war-ii/the-holocaust, (Aug. 29, 2019) ("Holocaust" refers to "the mass murder of some 6 million European Jews … by the German Nazi regime during the Second World War"). Michael A. Livingston, *Never Again … What? Law, History, and the Uses of the Holocaust*, 14 Rutgers J. L. & Religion 267 (2012) ("The Holocaust--the murder of six million European Jews in countries under German control between 1941 and 1945--is widely regarded as one of the major events of the twentieth century.")

constitute an objectively false representation of fact.[8]   The facts alleged in the complaint show Thiesen was expressing his own opinion of Plaintiff's "nuanced" or "revisionist" views.  Such an expression of personal opinion is not actionable under Kansas law.  Thiesen and Bethel are therefore entitled to dismissal of the defamation claim in Count 6.

   **e. & f.  Count 8 – intentional infliction of emotional distress (or "outrage"); Count 9 – negligent infliction of emotional distress**.   Count 8 alleges that Bethel intended to inflict significant emotional distress on Plaintiff "by causing him to be arrested as a consequence of his peaceable speech knowing that there was no basis for an allegation that Plaintiff had been clearly and irrevocably told not to return to campus."  (Doc. 1 at 38-39.)   Count 9 alleges Bethel negligently inflicted the same injury.

   Bethel argues Count 8 must be dismissed because Plaintiff has not alleged facts severe enough to support the tort of outrage under Kansas law or to show severe emotional distress.  (Doc. 30 at 18-19.)  It argues Count 9 fails because the complaint does not allege that Plaintiff suffered any physical injury.  In response, Plaintiff argues "that by definition it is an outrage when a people (church and academic community both) supposedly committed to hearing dissenters and to peaceful resolution of conflict resort to calling on law enforcement authorities to oust a peaceable but unwanted voice from their midst."  (Doc. 48 at 28.)  Plaintiff also contends he has sufficiently alleged severe distress from the arrest and physical injury from "being handcuffed, restrained and then confined…." (*Id.* at 19.)

---

[8] The "revisionist views" Plaintiff expressed or promoted at the conference are not fully described in the complaint, although the complaint mentions two books that Plaintiff "intended to hand out to interested registrants at the Conference …: Heddesheimer: The First Holocaust, and Mattogno, Auschwitz: A Three-Quarter Century of Propaganda." (Doc. 1 at 7.) Taken as a whole, the allegations in the complaint fail to show that Thiesen's statement could plausibly be considered a false statement of objectively verifiable fact, as opposed to Thiesen's personal opinion of Plaintiff's views.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.")

A plaintiff claiming intentional infliction of emotional distress (also known as "tortious outrage") under Kansas law must prove four elements: (1) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe. *Valadez v. Emmis Commc'ns*, 290 Kan. 472, 476, 229 P.3d 389, 394 (2010). The Kansas Supreme Court has said that to be actionable, conduct "must transcend a certain amount of criticism, rough language, and occasional acts and words that are inconsiderate and unkind." *Id.* at 477, 229 P.3d at 394. "The law will not intervene where someone's feelings merely are hurt." *Id.* Rather, "to provide a sufficient basis for an action to recover for emotional distress, conduct must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Id.* (citing *Taiwo v. Vu*, 249 Kan. 585, 592-93, 822 P.2d 1024, 1029 (1991)). Cases recognize that Kansas has set "a very high standard" for actionable conduct under which the "overwhelming majority of Kansas cases have held in favor of defendants on the outrage issue, finding that the alleged conduct was insufficiently 'outrageous' to support the cause of action." *Palmer v. Shawnee Mission Med. Ctr., Inc.*, 355 F. Supp. 3d 1003, 1021 (D. Kan. 2018) (quoting *Lindemuth v. Goodyear Tire & Rubber Co.*, 19 Kan. App. 2d 95, 864 P.2d 744, 749 (1993)).

The court finds the allegations in the complaint fail to show the type of conduct that will support a claim for outrage under Kansas law. Even accepting all of Plaintiff's allegations as true, they show essentially that Bethel failed to fully disclose all of the facts to the police when they accused Plaintiff of trespassing, and thereby caused his arrest. That conduct allegedly occurred following two disagreements with Plaintiff at the conference and after Bethel stated to Plaintiff he was "out of the conference." Regardless of whether such allegations are actionable as part of a

claim for false arrest, they do not rise to the level of outrageous conduct that Kansas considers "beyond the bounds of decency" or "utterly intolerable in a civilized society." *See e.g. Maxwell v. St. Francis Health Ctr.*, No. 17-4014-SAC, 2017 WL 4037732, *9 (D. Kan. Sept. 13, 2017) (knowingly submitting false statement to obtain default judgment was not sufficient); *Nooruddin v. Comerica Inc.*, No. 11-1188-EFM, 2011 WL 5588806 (D. Kan. Nov. 16, 2011) (bank falsely reporting overdrafts was not outrageous); *Neufeldt v. L.R. Foy Const. Co. Inc.*, 236 Kan 664, 668, 693 P.2d 1194, 1198 (1985) (knowingly and falsely telling a woman who recently suffered a miscarriage that the sheriff "was coming to get" her husband over a bad check was not sufficient); *Roberts v. Saylor*, 230 Kan. 289, 637 P.2d 1175 (1981) (not sufficient where doctor told woman who was lying on a gurney awaiting surgery that "I don't like you" and "I wanted to tell you that before you went in there."); *W-V Enter., Inc. v. Fed. Sav. & Loan Ins. Corp.*, 234 Kan 354, 673 P.2d 1112 (1983) (although defendant's conduct was "fraudulent and deceptive" it did not meet the definition of outrageous). Count 8 must therefore be dismissed.

Plaintiff's claim for negligent infliction of emotional distress in Count 9 must also be dismissed. "Kansas has long held that a plaintiff cannot recover for emotional distress caused by the defendant's negligence unless that emotional distress is accompanied by or results in physical injury to the plaintiff." *Majors v. Hillebrand*, 51 Kan. App. 2d 625, 628, 349 P.3d 1283, 1285 (2015) (citing *Hoard v. Shawnee Mission Med. Ctr.*, 233 Kan. 267, 274, 662 P.2d 1214 (1983)). "The qualifying physical injury 'must directly result from the emotional distress allegedly caused by the defendant's negligence and must appear within a short span of time after the emotional disturbance.'" *Id.* (citing *Hoard*, 233 Kan at 279, 662 P.2d at 1222). The complaint contains no allegation that Plaintiff suffered a physical injury contemporaneously with or as a result of

emotional distress negligently caused by Bethel. It accordingly fails to state a claim under Kansas law.

**g. Prayers for relief**. Bethel also seeks dismissal of two paragraphs in the complaint's the prayer for relief. (Doc. 30 at 20 (citing Doc. 1 at 43-44, ¶¶ 4, 9.)) These two paragraphs seek relief against Bethel despite Bethel not having been named in the underlying counts referred to in those paragraphs. Plaintiff concedes this was an error and that Bethel has no liability under these paragraphs. These portions of the complaint are accordingly dismissed as to Bethel.

**3. Mennonite Church, USA's (MCUSA) Motion to Dismiss (Doc. 34.)**

MCUSA argues the complaint fails to state a claim against it because it does not show MCUSA's responsibility for any tortious act. It argues the complaint improperly conflates MCUSA with Bethel by alleging that tortious acts were taken by the "Sponsors," that it fails to allege any facts showing MCUSA bears responsibility for the actions of Bethel employees, and that it otherwise fails to allege a tortious act by anyone with authority to act on behalf of MCUSA. (Doc. 35.) MCUSA further adopts the arguments of Bethel and Thiesen. (*Id.* at 13.) In response, Plaintiff argues the complaint is sufficient because it alleges MCUSA is responsible along with Bethel "through the acts of their joint representatives." (Doc. 49 at 1-2.) Plaintiff notes the complaint identifies Jantzen as a "Conference representative," which he argues shows Jantzen was acting on behalf of MCUSA. (*Id.* at 8.) Plaintiff also argues he has alleged that "both MCUSA and Bethel were involved in all of the wrongs he suffered" and that "[o]ne can be an agent or representative of a sponsoring organization without being its 'employee….'" (*Id.* at 17.) Plaintiff contends that under agency law, "when individuals at an event are alleged to be representatives of a collective (here a group of two Sponsors), then any of the acts of the representatives while in the course of their duties for Sponsors are chargeable to all of the Sponsors." (*Id.* at 19.)

Plaintiff's invocation of agency principles is unavailing under the facts alleged in the complaint. The complaint alleges that MCUSA and Bethel "sponsored" the conference (Doc. 1 at 4), identifies these two Defendants as "Sponsors," and then alleges that "Sponsors" or their "representatives" took various actions. Nowhere does the complaint allege facts showing what MCUSA's sponsorship consisted of, the nature of any arrangement MCUSA had with Bethel, what authority or control MCUSA had over the Bethel premises or over the conference, or any other facts indicating how being a "sponsor" makes MCUSA bound by or vicariously liable for actions of persons whom the complaint elsewhere identifies as employees of Bethel. Similarly, the complaint's identification of individuals as a "Sponsor's representative" or a "Conference representative" is a conclusion that fails to set forth a factual basis for holding MCUSA directly or vicariously liable for the actions of these individuals. *See e.g.*, Doc. 1 at 11 (identifying John Thiesen as a "representative[] of the Sponsors and employee[] of the College.") Plaintiff's assertion that MCUSA is liable under an agency theory is not plausibly supported by factual allegations in the complaint. Agency is the "relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Restatement (Second) of Agency* § 1 (1958.) A principal who engages an agent can be directly or vicariously liable for the tortious acts of an agent in a number of circumstances. *See e.g. Restatement (Third) of Agency* § 7.03. But absent any factual predicate showing that MCUSA had such an agency relationship with the individuals named in the complaint, and a factual predicate that supports direct or vicarious liability for such acts by an agent, the complaint fails to state a valid claim for relief against MCUSA.[9]

---

[9] Plaintiff again asserts that he should be allowed to amend the complaint if the court grants the motion. (Doc. 49 at 30.) As the court noted previously, requests to amend a complaint must comply with D. Kan. R. 15.1.

Count 1 alleges in part that MCUSA breached an agreement with Plaintiff by telling him and law enforcement officers that Plaintiff was trespassing, but it fails to allege facts showing MCUSA's responsibility for the individuals who allegedly performed such acts. The same is true with respect to the allegedly tortious acts relating to Plaintiff's arrest (Counts 2 and 3), the counts alleging defamation (Counts 5 and 6), and the remaining counts against or referring to MCUSA (Counts 8, 9, 10). Accordingly, MCUSA's motion to dismiss is granted.

**4. Joel Nofziger Motion to Dismiss and Motion to Strike** (Doc. 39.)

**a. Subject matter jurisdiction**. Nofziger first contends the court lacks subject matter jurisdiction over Plaintiff's defamation claim against him (Count 7.) Nofziger argues diversity jurisdiction is lacking as to this claim because the complaint seeks only $70,000 in damages with respect to that claim, and further argues that supplemental jurisdiction over the claim is lacking because it does not arise from a common nucleus of facts with the other claims.

Leaving aside the question of diversity jurisdiction, the court concludes Plaintiff has adequately alleged facts to support the exercise of supplemental jurisdiction. In any civil action in which the court has original jurisdiction – which it indisputably has here with respect to the other counts – the court "shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy" under the United States Constitution, including claims that involve the joinder of additional parties. 28 U.S.C. § 1367(a). A claim "is part of the same case or controversy if it derives from a common nucleus of operative fact." *Price v. Wolford*, 608 F.3d 698, 702-03 (10th Cir. 2010). In this instance, the court finds sufficient allegations of fact in common between Count 7 and the remaining claims, as well as a likelihood that evidence underlying these claims could overlap, such that the exercise of supplemental jurisdiction over the claim is justified. *See Leary*

*v. Centene Corp.*, 14-CV-2547-JWL, 2015 WL 1034343, *5 (D. Kan. Mar. 10, 2015) ("Even though plaintiff's allegedly defamatory statements were made after the end of her employment relationship with defendants, those statements are nevertheless sufficiently tied to her [whistleblower] claim to satisfy § 1367(a).") The alleged falsity of the statements published by Nofziger implicates facts and evidence pertaining to the underlying events at the conference itself, such that the defamation claim arises from a common nucleus of facts and forms part of the same case or controversy.

   **b. Personal jurisdiction**. Nofziger next contends this court lacks personal jurisdiction over him because Plaintiff fails to show that Nofziger intentionally directed his website at Kansas or otherwise had minimum contacts with Kansas. (Doc. 40 at 8-9.) In response, Plaintiff notes the complaint alleges that Nofziger was present at the conference in his capacity as an employee of the Lancaster Mennonite Historical Society ("LMHS"), and he argues that "Nofziger's business activities in connection with Mennonite history brought him to Kansas and … his business in Kansas resulted in the published libel." (Doc. 55 at 10.) Plaintiff further argues Nofziger "directed his Mennonite history-related information-gathering activities at conferees in Kansas in March 2018, resulting in the publication of the defamatory article." (*Id.* at 12.)

   "To establish personal jurisdiction over an out-of-state defendant, the plaintiff must make a prima facie showing that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *C5 Med. Works, LLC v. CeramTec GMBH,* 937 F.3d 1319, 1322 (10th Cir. 2019) (internal quotation marks and citation omitted.) Where the forum state's long-arm statute confers personal jurisdiction to the full extent constitutionally permissible (as Kansas's does), due process principles govern the inquiry. *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011);

*Freedom Transp., Inc. v. Navistar Int'l Corp.*, No. 2019 WL 4689604, *8 (D. Kan. Sept. 26, 2019) (because the Kansas long-arm statute allows jurisdiction to the extent permitted by due process, the court may "proceed directly to the constitutional issue" and "'need not conduct a statutory analysis apart from the due process analysis.'") (citation omitted.)

"Due process requires that the out-of-state defendant both 'purposefully established minimum contacts with the forum State' and that the 'assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *C5 Med. Werks,* 937 F.3d at 1322 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). "A defendant's contacts with the forum state can give rise to either general or specific jurisdiction." *Id.* Plaintiff does not argue or show any possible basis for general jurisdiction, which arises when a defendant's contacts with the forum state are "'so continuous and systematic as to render [him] essentially at home' there." *Id*. at 1323 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Specific jurisdiction – the basis asserted by Plaintiff – has a two-step inquiry: 1) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, 2) whether the defendant has presented a compelling case that other considerations would render jurisdiction unreasonable. *Id.* (citing *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017)). The minimum contacts test in turn has two requirements: 1) the defendant must have purposely addressed his activities at residents of the forum state; and 2) the plaintiff's injuries must arise out of the defendant's forum-related activities. *Id.*

The Tenth Circuit has noted that in the context of internet activities, it is untenable to maintain that merely placing information on the internet subjects a person to personal jurisdiction wherever that information is accessed. *Shrader,* 633 F.3d at 1240. "Similarly, posting allegedly defamatory comments or information on an internet site does not, without more, subject the poster

to personal jurisdiction wherever the posting could be read (and the subject of the posting may reside)." *Id.* at 1241 (citation omitted.) Rather, emphasis must be placed "on the internet user or site *intentionally directing* his/her/its activity or operation *at* the forum state rather than just having the activity or operation accessible there." *Id.* (italics in original). In this context, "the forum state itself must be the focal point of the tort." *Id.* at 1244 (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1074, n.9 (10th Cir. 2008)).

Under the foregoing standards, Plaintiff has failed to make a prima facie showing that this court has personal jurisdiction over Nofziger. Plaintiff makes no showing that Nofziger purposely directed his act of publishing the challenged statements at Kansas residents or that Plaintiff's injuries arose out of Nofziger's activities in Kansas. The complaint alleges that Nofziger is a resident of Pennsylvania and that he worked for the LMHS, which is also identified as a Pennsylvania resident. (Doc. 1 at 2-3.) Plaintiff alleges that Nofziger attended the conference in Kansas, but Nofziger's alleged defamation arises not from those activities, but from his subsequent publication of comments on "the Anabaptist Historians website," a "church-related site or publication" with no alleged links or particular connection to Kansas. (Doc. 1 at 21-22.) Nofziger's allegedly tortious act, which was to publish statements by "one Lisa Schirch," bears no apparent connection to Kansas except that the actions described by Schirch took place in Kansas. (*Id.* at 21.) Nofziger allegedly published the comments "to a significant audience of readers of [the] website, many of whom were drawn to what seemed like reputable news coverage of the 'Mennonites and the Holocaust' conference." (*Id.* at 37.) But there is no allegation that the publication was specifically directed at Kansas residents. Moreover, Plaintiff alleges that the defamation caused injury to his reputation, to his work as a lawyer, to his law practice, and to personal relationships. (Doc. 1 at 37-38.) Plaintiff is a resident of California and is licensed to

practice law in that state. Nothing is alleged to show that his alleged injuries occurred in Kansas or arise out of any acts by Nofziger in Kansas. *Cf. Shrader*, 633 F.3d at 1241 ("courts look to indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state.") Plaintiff's allegations fail to show that Nofziger intentionally directed his activity at the State of Kansas or its residents such that he should reasonably anticipate being hailed into court here for publication of statements about Plaintiff on the Anabaptist website. Because Plaintiff fails to make a prima facie showing that Nofziger had the requisite minimum contacts with Kansas, this court lacks personal jurisdiction over Nofziger and the claim against him must be dismissed.

In view of this finding, the court does not address the additional arguments raised by Nofziger in his motion, including his request for attorney's fees pursuant to the Kansas Public Speech Protection Act, K.S.A. 60-5320, also know as the "Anti-SLAPP" [Strategic Lawsuit Against Public Participation] statute. There is substantial uncertainty as to whether a provision like K.S.A. 60-5320 constitutes substantive law, which must be applied by a federal court exercising diversity jurisdiction, or whether it amounts to a procedural rule that is displaced in diversity cases by contrary federal rules.[10] The court need not resolve the procedural/substantive

---

[10] Section 60-5320 essentially authorizes an expedited motion to dismiss claims that potentially burden First Amendment rights. It allows early dismissal of such claims if a plaintiff fails to show a likelihood of success on the merits. Judge Murguia recently concluded section 60-5320 amounts to substantive law, although his opinion acknowledged the "persuasive" reasoning of contrary decisions such as *Abbas v. Foreign Policy Group, LLC,* 783 F.3d 1328 (D.C. Cir. 2015), which held that a federal court sitting in diversity could not apply a similar District of Columbia law because Federal Rules of Civil Procedure 12 and 56 establish the standards that govern pre-trial motions to dismiss, and they do not require a plaintiff to show a likelihood of success on the merits. *Caranchini v. Peck*, 355 F. Supp. 3d 1052, 1060 (D. Kan. 2018). Judge Murguia also conceded that K.S.A. 60-5320 is "procedural in nature," but he ultimately concluded it should be applied because it was intended to influence substantive outcomes and its application was consistent with *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). *See Caranchini*, 355 F.Supp. 3d at 1058 (relying in part on *Godin v. Schencks,* 629 F.3d 79 (1st Cir. 2010) (finding Maine anti-SLAPP law applied to state law claims in federal court). Judge Murguia also distinguished a Tenth Circuit decision, *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659 (10th Cir. 2018), which held that a New Mexico anti-SLAPP provision did not apply in a diversity case, on the grounds that the New Mexico law was materially different from the Kansas provision.

question here because, in either event, this court cannot rule on a motion under K.S.A. 60-5320 when it lacks personal jurisdiction over the party asserting the motion. The statute requires a court to make a determination relating to the merits of the claim, which is wholly inappropriate for a court lacking personal jurisdiction over one of the parties to the dispute. *Cf. Forras v. Rauf*, 812 F.3d 1102, 1105 (D.C. Cir. 2016) ("The district court plainly should have satisfied any jurisdictional concerns before turning to a merits question like the Anti–SLAPP Act.") Inasmuch as this court lacks jurisdiction over Defendant Nofziger, it has no authority to examine the merits of the claim against him or to grant his request for relief under section 60-5320.

## IV. Conclusion

Defendant City of North Newton's Motion to Dismiss (Doc. 24) is GRANTED. Counts 4 (false arrest) and 10 (section 1983) are DISMISSED as to the City of North Newton.

Defendants Bethel and John Thiesen's Motion to Dismiss (Doc. 29) is GRANTED IN PART and DENIED IN PART. As to Bethel, the motion is granted as to Counts 3 (negligent false arrest), 5 (defamation – false arrest statement), 6 (defamation – Thiesen statement), 8 and 9 (intentional and negligent infliction of emotional distress), and paragraphs 4 and 9 of the prayer for relief (Doc. 1 at 43-44). The foregoing counts are dismissed as to Bethel. The motion is denied as to Counts 1 (breach of contract), and 2 (false arrest), against Bethel. As to Thiesen, Count 6 (defamation) is dismissed; Thiesen is dismissed from the action.

Defendant MCUSA's Motion to Dismiss (Doc. 34) is GRANTED. All counts against MCUSA (Counts 1,2,3,5,6,8, and 9) are dismissed.

Defendant Joel Nofziger's Motion to Dismiss (Doc. 39) is GRANTED. Count 7 (defamation) against Nofziger is dismissed based on this court's lack of personal jurisdiction over

Defendant Nofziger. For the same reason, Nofziger's Motion to Strike the Complaint and for Attorney's Fees is dismissed.

Plaintiff's Motion for Order (Doc. 47) to take judicial notice is DENIED.

IT IS SO ORDERED this 28th day of October, 2019.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE