IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRUCE LEICHTY,                              )
                                           )
              Plaintiff,                    )
                                           )      No. 6:19-cv-01064-JWB-KGG
v.                                          )
                                           )
BETHEL COLLEGE; MENNONITE                   )
CHURCH USA; CITY OF NORTH                   )
NEWTON, KANSAS; JOHN THIESEN;               )
JOEL NOFZIGER;                              )
                                           )
              Defendants.                   )
_____ )

MOTION OF PLAINTIFF FOR ORDER AUTHORIZING FILING
OF FIRST AMENDED COMPLAINT AND PREDICATE RELIEF AS NEEDED

Plaintiff Bruce Leichty (hereinafter "Plaintiff" or "Leichty"), Pro Se,  hereby moves this

Court for an order authorizing filing of a first amended complaint pursuant to F.R.Civ.P. 15(a)(2)

and District of Kansas Local Rule15.1 in light of the Court's Order and Memorandum filed

October 28, 2019 granting certain motions to dismiss directed at the initial complaint filed herein

("10/28 Order").   The motion is made on the grounds that none of the causes of action that were

subject to the Court's 10/28 Order were dismissed "with prejudice," and that neither Mennonite

Church USA or City of North Newton were by way of the 10/28 Order dismissed as parties and

they have not yet been dismissed as parties to the action.  The motion is made on the additional

grounds that even though Plaintiff is no longer allowed to file an amended complaint as a matter of

right, Plaintiff can amend to state a valid cause of action against Mennonite Church USA, a joint

venturer with Bethel College in the "Mennonites and the Holocaust" conference which is the

subject of the litigation and in all acts for which Bethel College is already held answerable, and on

1

the further grounds that Plaintiff can amend to state valid causes of action against City of North

Newton both under K.S.A 12-105b, which qualifying statute Plaintiff has now complied with and

which compliance has led to the administrative denial of Plaintiff's claim presented to that

municipality, and under 42 U.S.C. Section 1983 irrespective of Plaintiff's rights under Kansas law

since Plaintiff's arrest was pursuant to the custom and practice of the City and Plaintiff can

plausibly plead that element of his case; and that F.R.Civ.P. 15(a)(2) permits these amendments

and Supreme Court policy favors allowing them, without any predicate relief needed.

Moreover, even though Plaintiff believes that he is not required and should not be required

to file a "motion to reopen" the case under F.R.Civ.P. 59 or 60 as some 10th Circuit authority

might suggest, at least when the case is not dismissed or the applicable parties have not been

dismissed, Plaintiff requests that this motion also be treated as a motion to reopen under either of

those rules to the extent that the Court would deem that a requirement as a predicate for seeking

leave to amend.   In support of the Motion, Plaintiff is concurrently filing a Memorandum in

Support of his Motion, pursuant to District of Kansas Local Rule 7.1(a), which addresses the

above issues.   The First Amended Complaint which Plaintiff proposes to file is attached hereto

pursuant to Local Rule 15.1(a)(2).

WHEREFORE, Plaintiff Bruce Leichty requests that the Court grant his motion for order

authorizing filing of a First Amended Complaint as set forth in the accompanying Memorandum.

Respectfully submitted by,

/s/ Bruce Leichty
Bruce Leichty, In Pro Per
c/o Bruce Leichty, A Prof. Corp.
220 W. Grand Ave.
Escondido, CA 92025
(760) 484-2467
Fax: (951) 676-7462
leichty@sbcglobal.net

CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of November 2019, the foregoing was filed with the Clerk of the Court of the Kansas District Court using the CM/ECF system which will send notice of electronic filing to all counsel of record, including the following:

/s/ Bruce Leichty
Bruce Leichty, Plaintiff

Scott E. Sanders
Corey M. Adams
McDonald Tinker PA
300 W. Douglas, Ste. 500
Wichita, KS 67202
Phone: 316-263-5851
Fax: 316-263-4677
ssanders@mcdonaldtinker.com
cadams@mcdonaldtinker.com
Attorneys for Bethel College [and  John Thiesen sued as John Thiessen]

Alan L. Rupe
Kevin E. Miller
Lewis Brisbois Bisgaard & Smith, LLP
1605 N. Waterfront Parkway, Ste. 150
Wichita, KS 67206
Phone: 316-609-7900
Fax: 316-462-5746
alan.rupe@lewisbrisbois.com
kevin.miller@lewisbrisbois.com
Attorneys for Mennonite Church USA

Tracy M. Hayes
Robert M. Reynolds
Sanders Warren Russell & Scheer LLP
430 Corporate Woods
9401 Indian Creek Parkway, Ste. 1250
Overland Park, KS 66210
Phone: 913-234-6100
Fax: 913-234-6199
t.hayes@swrsllp.com
r.reynolds@swrsllp.com
Attorneys for City of North Newton, Kansas

ATTORNEYS AND PARTIES NOT IMPLICATED BY MOTION:

Eric A. Van Beber
Kevin D. Weakley
Wallace Saunders
10111 W. 87th St.
Overland Park, KS 66212
Phone: 913-888-1000
Fax: 913-888-1065
evanbeber@wallacesaunders.com
kweakley@wallacesaunders.com
Attorneys for Lancaster Mennonite Historical Society [dismissed by stipulation]

Thomas P. Schult
Jennifer B. Wieland
Berkowitz Oliver LLP
2600 Grand Boulevard, Ste. 1200
Kansas City, MO 64108
Phone: 816-561-7007
Fax: 816-561-1888
tschult@berkowitzoliver.com
jwieland@berkowitzoliver.com
Attorneys for Joel Nofziger [party dismissed 10/28/2019]

Jay P. Lefkowitz
Joseph M. Sanderson
Kirkland & Ellis - New York
601 Lexington Avenue
New York, New York 10022
Phone: (212) 446-4800
Fax: (212) 446-4900
lefkowitz@kirkland.com
joseph.sanderson@kirkland.com
Attorneys for Joel Nofziger [party dismissed 10/28/2019]

Kelsey N. Frobisher
Foulston Siefkin LLP
1551 N. Waterfront Parkway, Ste. 100
Wichita, KS 67206-4466
Phone: (316) 267-6371
Fax: (866) 347-3808
kfrobisher@foulston.com
Attorney for Harvey County [party dismissed 7/19/19]

Toby Crouse
Crouse LLC
11184 Antioch, No. 253
Overland Park, KS 66210
Phone:   (913) 957-6832
tcrouse@crousellc.com
Attorney for Harvey County [party dismissed 7/19/19]

Bruce Leichty
c/o Bruce Leichty, A PC
220 W. Grand Avenue
Escondido, CA  92025
(760) 484-2467
(951) 676-7462 (fax)
leichty@sbcglobal.net
1925FAC.B24
In Pro Per

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BRUCE LEICHTY,<br><br>    Plaintiff,<br><br>v.<br><br>BETHEL COLLEGE;<br>MENNONITE CHURCH USA;<br>CITY OF NORTH NEWTON,<br>KANSAS;<br><br>    Defendants. | Case No. 19-1064-JWB<br><br>FIRST AMENDED COMPLAINT FOR MONEY DAMAGES ARISING OUT OF BREACH OF CONTRACT (LICENSE AGREEMENT) AND INTENTIONAL TORT, INJUNCTIVE RELIEF RE: FALSE ARREST AND FALSE IMPRISONMENT; AND FOR DAMAGES FOR VIOLATION OF FEDERAL CIVIL RIGHTS (42 U.S.C. Section 1983) |

Plaintiff BRUCE LEICHTY ("Plaintiff"), hereby complains of Defendants BETHEL COLLEGE, MENNONITE CHURCH USA; and CITY OF NORTH NEWTON, KANSAS (collectively "Defendants") and alleges as follows:

JURISDICTION AND VENUE

1. This court has jurisdiction over this action under 28 U.S.C. Section 1332 pertaining to civil actions where the amount

in controversy exceeds $75,000 exclusive of interest and costs and where the controversy or dispute is between the citizens of different states; and under 42 U.S.C. Section 1983 based on Plaintiff's allegations that government defendants violated his federal civil rights.

2.  Plaintiff is an individual who is a resident and citizen of the State of California.

3.  Defendant Bethel College is a citizen of the State of Kansas and is incorporated in and has its principal place of business in the State of Kansas.

4.  Defendant Mennonite Church USA is a citizen of the State of Indiana and is incorporated in and has its principal place of business in the State of Indiana.

5.  Defendant City of North Newton, Kansas is a citizen of the States of Kansas and is a governmental entity located in the State of Kansas.

6.  As noted below, the Plaintiff has suffered damages exceeding $75,000, exclusive of interest and costs, as a result of his false arrest and false imprisonment by government defendant City of North Newton, initiated by and arising from communication of false information about Plaintiff by Defendants Bethel College and Mennonite Church USA, and as a result of the breach of contract/license agreement with Plaintiff by Defendants Bethel College and Mennonite Church USA, some of which conduct deprived Plaintiff of his federal civil rights and all of which caused him significant economic and noneconomic injury.

7.    Since this First Amended Complaint is being filed November 25, 2019, Plaintiff's claim based on the facts and damages recited herein under the Kansas Tort Claims Act is being made after notice to City of North Newton of Plaintiff's claim and opportunity given to the City to resolve the claim informally, and after the passage of 120 days from its presentation on July 17, 2019 to the City whereupon it has been deemed denied.

8.    None of the causes of action herein or in a substantially equivalent complaint have previously been filed in this court other than by way of the original complaint filed in this action in March 2019.

## GENERAL ALLEGATIONS

9.    At some point weeks before March 15, 2018, Plaintiff registered for a conference titled "Mennonites and the Holocaust" sponsored by Bethel College ("College" or "Bethel") and Mennonite Church USA ("MCUSA") scheduled entirely for the campus of Bethel College, North Newton, Kansas March 16-17, 2018 (the "Conference").

10.    Bethel at the time of the Conference was a four-year liberal arts college affiliated with the Mennonite Church USA with a student body of approximately 470 (based on Fall enrollment figures for the 2017-18 academic year).

11.    At the time of the Conference Bethel was one of the largest if not the largest employer in the City of North Newton,

a town with a population of about 1754 based on U.S. census estimates for 2017.

12.    MCUSA was at the time of the Conference a religious denomination with a long-standing presence in Kansas, having a membership of approximately 69,223 at the time of the Conference based on 2018 church statistics.

13.    As of 2018, MCUSA still maintained some of its administrative offices in Newton, Kansas, the town adjacent to the City of North Newton.

14.    Whether or not they were the only partners or joint venturers, MCUSA and Bethel were partners or joint venturers in the planning for, publicity for, leadership of, organization of, and administration of the Conference.

15.  On information and belief, there were other sponsors of the Conference ("Other Sponsors"), not sued herein, who were also part of and partners or joint venturers with MCUSA and Bethel in planning for, publicizing, leading, organizing and administering the Conference.

16.    The joint venture between MCUSA, Bethel and Other Sponsors if any ("Conference Organizers"), had the right to use the land, campus and facilities of Bethel College, or a subset thereof, for the days of the Conference.

17.  All of the events of the Conference were scheduled to take place on the campus of Bethel.

18.  Bethel College was operating for the benefit of its students and continued to conduct its normal operations as a

four-year college at all times while the Conference was in session.

19. The partnership or joint venture of MCUSA, Bethel and Other Sponsors if any in holding the Conference was achieved by the collaboration of a number of individuals including but not necessarily limited to Mark Jantzen, John Thiesen and John Sharp.

20. Before and during the Conference Jantzen, Thiesen and Sharp were all representatives of the Conference Organizers and were the main representatives of the Conference Organizers for the purpose of holding the Conference.

21. MCUSA has no members who are individuals but instead consists of affiliated congregations; and Jantzen, Thiesen and Sharp are, and were at the time of the Conference, members of congregations affiliated with MCUSA.

22. Jantzen, Thiesen and Sharp all functioned in their capacity with Conference Organizers as representatives of MCUSA with respect to the planning of, publicity for, leadership of, organization of, and administration of the Conference.

23. Jantzen, Thiesen and Sharp presented themselves both to Conference attenders and Plaintiff as representatives of the Conference Organizers.

24. Jantzen, Thiesen and Sharp presented themselves both to Conference attenders and Plaintiff as the coordinators of the Conference without claiming some status distinct from one or more of the partners in the Conference Organizers.

25. Alternatively to Paragraph 24, Jantzen, Thiesen and

Sharp presented themselves both to Conference attenders and Plaintiff as the coordinators of the Conference and representatives of Conference Organizers without claiming affiliation with only Bethel or MCUSA.

26.   At the time of the Conference Jantzen was also an employee of Bethel College.

27.   At all times relevant hereto, Jantzen by his actions in connection with the Conference, whether visible to Conference attenders generally or Plaintiff specifically, made it clear that he was acting on behalf of the Conference Organizers, including Bethel and MCUSA.

28.   At no time before or during the Conference did Jantzen by any of his actions or speech made manifest to the public, or to Conference attenders generally or Plaintiff specifically, ever deny that he had authority to act or that he was acting in connection with the Conference both on behalf of Bethel and the Conference Organizers including MCUSA.

29.   Plaintiff learned about the "Mennonites and the Holocaust" Conference set for March 2018 because it was announced as an upcoming conference of MCUSA and Bethel at the sessions of the 2017 biennial MCUSA Conference held in Orlando, Florida, at which Plaintiff was in attendance.

30.   It was known broadly throughout MCUSA prior to the Conference that MCUSA was one of the partners, joint venturers or co-sponsors of the Conference.

31.   The Conference was also publicized in advance of the

meeting by one of the most prominent "Mennonites and the Holocaust" scholars affiliated with MCUSA, Benjamin Goossen, who has no affiliation with Bethel College.

32.  In an article written by Goossen a year prior to the Conference, for Religion News Services, titled "Mennonites seek to come to terms with Nazi collaboration," Goossen wrote about a symposium that had taken place in Paraguay on the subject before stating, "Discussion will continue at a third conference, on 'Mennonites and the Holocaust.'  Scheduled for March 2018 at Bethel College in North Newton, Kan., the event is sponsored by Mennonite Church USA, the largest Mennonite denomination in North America."

33. Plaintiff is a citizen of the United States who was at the time of his trip to Kansas to attend the Conference was 63 years of age.

34.  Plaintiff as of his arrival in Kansas to attend the Conference had never been arrested and had no criminal record.

35.  Plaintiff as of his arrival in Kansas was a member of the California Bar in good standing, without any disciplinary record, and had practiced law as a private practitioner for over 30 years, although never in Kansas.

36.  Plaintiff was as of the time of the Conference a member of a congregation affiliated with Mennonite Church USA and at one time had been enrolled in a class at Bethel College, where he has done research in the on-campus archives from year to year over the past couple decades, facts known to Conference Organizers and

specifically to Defendants Bethel College and MCUSA and/or their representatives.

37.   Prior to planning and making his trip from California to the Conference, Plaintiff was aware that one or more members of the Bethel College history faculty had been among the leading spokespersons in the United States decrying what they contended was propaganda used in the United States to support past wars, and on that basis and other bases, Plaintiff believed that Bethel College was an ardent advocate for and/or protector of for the right to dissent and free speech, especially when it came to war-related controversy.

38.   A year earlier, Plaintiff had been threatened with a trespassing arrest by armed law enforcement personnel in Florida acting at the request of MCUSA.

39.   Law enforcement officers were called upon by MCUSA and its representatives to confront Plaintiff at the 2017 MCUSA biennial convention at Orlando, Florida, at which Plaintiff was a duly-appointed registered congregational delegate who had paid a registration fee to be a participant at the convention.

40.   At the time he was confronted in Orlando, Plaintiff was passing out literature at the convention relating to a resolution that was to be considered by convention delegates on "Israel and Palestine," and was told he was prohibited from doing so.

41.   Even though Plaintiff believed that his tract distribution oriented to education and spiritual discernment at the 2017 MCUSA Conference was consistent with the purposes of the

MCUSA convention, Plaintiff avoided arrest at that time by agreeing to not hand out literature on the convention grounds.

42. Plaintiff was personally confronted at the time of the arrest threat at the 2017 MCUSA Convention by Glen Guyton, then the convention coordinator for MCUSA and now the executive secretary of MCUSA, who told Plaintiff he was not "afraid" of Plaintiff because he (Guyton) had served in the military.

43. Guyton represented to Plaintiff at the 2017 event, and Plaintiff in turn expressed to Guyton that he disagreed, that MCUSA had the power to expel Plaintiff from the Conference irrespective of his delegate status or paid-for registration.

44. At the start of the Conference (in Kansas March 16, 2018), Plaintiff's registration for the Conference was accepted and he was prior to the start of the Conference issued a badge and conference materials by Conference Organizers, confirming his right to be present at and attend the Conference.

45. Plaintiff by his act of paying the Conference registration of $100 and by the act of Conference Organizers of issuing him a badge and materials was effectively made a licensee who was allowed to participate in the Conference and be present on the campus of College for the duration of the Conference.

46. Alternatively to Paragraph 45 above, Plaintiff by his act of paying the Conference registration of $100 and by the Sponsors' act of issuing him a badge and materials was effectively made a licensee who was allowed to participate in the Conference and be present on the campus for the duration of the

Conference, at least absent any violation on Plaintiff's part of any announced or written rules for the Conference made available to Conference registrants or failure to comply with said announced or written rules.

47. Alternatively to Paragraphs 45 and 46 above, or in addition thereto, Plaintiff by his act of paying the Conference registration of $100 and by the Sponsors' act of issuing him a badge and materials entered into a binding contract for consideration allowing him to participate in the Conference and be present on the campus for the duration of the Conference, at least absent any violation on Plaintiff's part of any announced or written rules for the Conference made available to Conference registrants or failure to comply with said announced or written rules.

48. In the expectation of his permitted participation as a registrant at the Conference, Plaintiff incurred significant expenses in order to make the trip from his home in Temecula, California to central Kansas, including to engage in a part-day of pre-conference research on Mennonites and the Holocaust at the archives located on the campus of Bethel College, where Plaintiff was a known researcher.

49. In addition to paying the Conference registration fee, Plaintiff paid for round trip airfare from southern California to central Kansas and for related airport parking charges and rental car expense, and for his lodging for the four (4) days and nights he had planned to be in Kansas in connection with his attendance

at the Conference, having expended the amount of $1,500 or its equivalent subject to further proof.

50.  In order to be able to attend the Conference Plaintiff, an attorney licensed in California whose past practice has extended to multiple federal jurisdictions and admission to the United States Supreme Court, also sacrificed billable hours or their equivalent which he would have otherwise been able to devote to one or more of his legal cases, consisting of at least two full days of time, or at least 10 hours of billable time considering Plaintiff's case load.  At Plaintiff's then-hourly rate of $250, Plaintiff sacrificed income of no less than $2,500 to be able to attend the Conference.

51.  In anticipation of dialogue with Conference registrants Plaintiff also obtained and purchased a large quantity of pamphlets and books that he intended to hand out to interested registrants at the Conference, including Heddesheimer: The First Holocaust, and Mattogno, Auschwitz: A Three-Quarter Century of Propaganda, at a cost to Plaintiff of some $300.

52.  At the Conference, Plaintiff anticipated that there would be times for mingling with registrants, informal conversations with registrants, and questions and comments from registrants at the end of formal sessions, as there in fact were.

53.  At all times prior to the Conference, Plaintiff intended to respect the academic research that had gone into the Conference, subject to the kind of evaluation and testing that is allowed by participants conducting themselves in a civil manner

at such a conference, and at all times viewed himself as a person who could offer to interested registrants--particularly persons with a history of championing the rights of minorities and dissenters--additional overlooked perspectives and resources on the subject of "Mennonites and the Holocaust" or the Holocaust generally, as opportunity presented itself at the Conference without violating any rules or regulations, and at a separate event he had planned for a location near the College.

54. Plaintiff at no time prior to the Conference or while attending the Conference harbored or held a motivation or intent to disrupt the Conference or interfere with any presentation or any registrant's question or comment.

55. Plaintiff in fact did not disrupt the Conference or interfere with any presentation or any question or comments by a registrant.

56. Plaintiff at no time prior to the Conference or while attending the Conference harbored or held any motivation or intent to violate any rules or regulations associated with the Conference, although he had not been made aware of any explicit rules or regulations.

57. Plaintiff at no time prior to arriving at the Conference or prior to the first presentation was made aware of any explicit rules or was given any written rules restricting the conduct of registrants at the Conference.

58. Plaintiff in going to the Conference did not expect either to be threatened with arrest or arrested, nor did he wish

to be arrested, nor did his expectations change at any time while he was at the Conference up until the time on March 17 when he was told he had no choice but to surrender to arresting authorities.

59.   Plaintiff had invited two professional individuals of self-identified Jewish origin or identity to take part in the Conference with him as registrants; and, on the side, to make their own presentation titled "Two Jewish Revisionists Consider the Holocaust," at a community room in North Newton near Bethel College rented by Plaintiff on the evening of March 16 at a time when no other activity was planned.

60.   Due to a mix-up, Plaintiff's two guests had not pre-registered for the Conference, and they were denied by Conference Organizers the ability upon their arrival to the College to register for the first day of the Conference, even though they were willing to pay the normal registration and forego any meals that were part of the Conference, and even though there was always ample space available in the lecture hall where the presentations were made.

61.   The Conference representative who denied them the right to register, Mark Jantzen, agreed that the issue of the registration of Plaintiff's guests could be revisited the following day since they had traveled from New York and Michigan respectively; and notwithstanding their exclusion from most of the events planned for the first day of the Conference March 16, Plaintiff's guests attended certain sessions open to the public,

and made their own presentation off campus as planned on the evening of March 16.

62. Plaintiff was prevented by the Conference sponsors upon his arrival at the Conference from handing out flyers, pamphlets or books in the foyer outside the lecture hall where the sessions were to be held, which flyers contained information about the off-campus presentation by his guests, despite the fact that there had been no rules announced to him prohibiting distribution of any materials by registrants to other registrants.

63. On information and belief, there were no rules announced in writing to registrants or anyone else prior to the Conference prohibiting distribution of any materials to other registrants.

64. On information and belief, there were no rules announced to registrants that prohibited distribution of any materials to other registrants, prior to Plaintiff being confronted by Sponsors in the foyer before the opening session on March 16.

65. When confronted by Conference sponsors during the course of distributing flyers on the morning of March 16, 2018, and as Plaintiff politely asserted what he regarded as his rights as a Conference registrant on a college campus (and particularly this campus of his own dissent-friendly religious denomination), Plaintiff was threatened with arrest, and a law enforcement officer from the City of North Newton was called to the scene, after which Plaintiff consented to refrain from distributing

materials in exchange for his ability to remain at the Conference.

66. Plaintiff thereafter discontinued distribution to registrants of any flyers or books and at no time thereafter initiated any distribution to registrants of any flyers or books.

67. As a consequence of the above-referenced March 16 conversation that he was engaged in with Conference sponsors or their representatives about his distribution of flyers in the foyer, Plaintiff missed the opening remarks of the Conference made to all or most of the registrants for the Conference, assembled in the lecture hall.

68. Plaintiff is informed and believes and thereupon alleges that Thiesen, on behalf of Conference Organizers, announced at the opening session to the assembled registrants that there was a "Holocaust denier" present at the Conference who had disrupted the Conference or would or might disrupt the Conference.

69. On information and belief, Thiesen was referring to Plaintiff.

70. On information and belief, there was no one other than Plaintiff who registered for the Conference who was associated in writing with persons having revisionist views on the Holocaust, as Plaintiff was in the context of his flyer for the event he and his Jewish colleagues were hosting March 16, 2018.

71. Plaintiff was not on March 16, 2018 and has never been and is not a "Holocaust denier."

72. Plaintiff has never claimed that the pejorative label "Holocaust denier" accurately describes him or that it accounts for the complexity or nuances of his historical views, nor has he ever used the terms or label to describe himself or knowingly allowed it to be used of him where he had any ability to rebut the use.

73. Plaintiff is aware that to be branded a "Holocaust denier" is one of the most damning slurs that can be used against a person in contemporary United States parlance, regardless of its implications.

74. After his encounter with Conference Organizers prior to the opening session on March 16, Plaintiff attended without incident the remainder of the morning sessions, conversing peaceably with a number of registrants including about the planned presentation of his guests off-campus later that day.

75. Plaintiff's participation in the Conference was again challenged, however, at the last session of the afternoon on March 16, at a panel on "Mennonite Attitudes Toward the Holocaust," when he raised his hand and asked for the microphone as a question and answer session was drawing to a close.

76. Plaintiff was recognized, given access to a microphone, and reminded to keep his comments "on point," after two other participants had made comments without posing any question to one of the panelists.

77. At no time prior to taking the microphone as a registrant on the afternoon of March 16 had Plaintiff ever been

told that any particular comment or substantive remark or question related to the Holocaust was prohibited.

78. On information and belief, Sponsors had never announced to registrants generally that any comments or substantive remarks or questions "off limits" about the Holocaust were prohibited during the Conference.

79. Plaintiff when recognized with the microphone stated to those assembled that "just as there are different Mennonites attitudes toward the Holocaust, there are also different Jewish attitudes toward the Holocaust," and he began announcing that registrants could take a unique opportunity to hear a revisionist Jewish perspective on the Holocaust at a nearby location that evening; however, Plaintiff was angrily interrupted by session moderator Mark Jantzen who called for Plaintiff's microphone to be cut and began charging up the aisle toward the place where Leichty was standing, loudly calling by means of his mobile phone for police response.

80. Plaintiff's microphone was cut, and Plaintiff was able to complete his announcement only amidst competing noise and a number of shouts and jeers of derision, inspired by the earlier statement of Thiesen about Plaintiff's presence at the conference, and at that time the session leader also announced that the session had ended.

81. Plaintiff at no time used inappropriate language or voiced any hatred or animus toward Jews or Conference Organizers during his brief interrupted comment.

82.   With the session ended, Plaintiff began to leave the room, but was approached by one of the representatives of the Conference Organizers, John Sharp, who had been seated nearby; Plaintiff was then accompanied to the parking lot by Sharp, at which point he and Sharp agreed that they would meet at lunch the next day to discuss Plaintiff's agenda and concerns.

83.   As he was exiting the parking lot, Plaintiff also had an amicable exchange with North Newton police chief Randy Jordan (his second encounter with Jordan that day), when the Chief drove by Plaintiff's car, at which time Plaintiff initiated the conversation and told Chief Jordan through the rolled-down windows of the two vehicles that he was leaving the campus and was on his way to set up the community room in North Newton (adjacent to the police station) for the event that he would be moderating, an event whose scheduling was known to Chief Jordan.

84.   At no time either during the morning or afternoon of March 16 had Plaintiff been ordered to not return to the campus.

85.   At no time either during the morning or afternoon of March 16 was Plaintiff ever told that his permit or license to be present on the campus as a Conference registrant was terminated or revoked.

86.   At no time either during the morning or afternoon of March 16 was Plaintiff ever told that he had violated the terms of the agreement under which he had first been allowed to be a Conference registrant and participant, or under which he had continued to be recognized as such that morning.

87.  Plaintiff and his guests thereafter conversed amicably for about 20 minutes at the North Newton community room with Police Chief Jordan about the basis for their presentation and the anomaly of the actions of the Conference Organizers and Bethel, after setting up the room.

88.  At no time during Plaintiff's interactions with Chief Jordan did Chief Jordan ever tell Plaintiff that he had been ordered to not return to the Bethel College campus.

89.  After Plaintiff had moderated and his guests had civilly and peaceably made their 6 p.m. presentation to a small group assembled at the North Newton community room, Plaintiff and one of his guests returned to the College campus for the evening event, a film open to the public, after which Plaintiff spoke with Jantzen asking him whether the Conference Organizers would now agree to allow his guests to register for and attend the sessions the next day (the last day of the two-day Conference).

90.  Plaintiff advised Jantzen as part of his request that he and his guests had already concluded their own presentation off campus, and that none of them would have a further event that they would try to announce to registrants.

91.  Instead of granting the request, Jantzen instead told Plaintiff, "Not only will they not be allowed to register, you are also out of the conference."

92.  Plaintiff did not know then and does not know now the authority Jantzen had to control access to or the use of the Bethel campus, and Plaintiff knew only at the time that Jantzen

was employed as a professor of history at the College and that on March 16 he had held himself out as a representative for the Conference Organizers and as one with the power to determine who could register and receive a name tag or badge.

93.   When Jantzen made the above statement to Plaintiff, Plaintiff in turn reminded Jantzen that Plaintiff was a previously admitted paid registrant, and that Plaintiff had a right to attend the Conference sessions.

94.  At no time did Jantzen or anyone else tell Plaintiff at any time on March 16 that Plaintiff was ordered or had been ordered to not return to the campus, let alone use the word "trespass."

95.  At no time did Jantzen or anyone else specify that Plaintiff was being prohibited from returning to the campus as distinguished from the Conference.

96.  At no time did Jantzen or anyone else revoke or purport to revoke the invitation to Plaintiff from John Sharp to meet with Sharp for conversation at lunch on March 17.

97.  Plaintiff as of the time of the conclusion of his last conversation with Jantzen on March 16 believed that any issue regarding his right to attend the Conference was a civil dispute, and not a criminal matter, particularly since at no time had the word "trespass" ever been used in Plaintiff's presence nor had he ever been told that he needed to leave the grounds of the College after what was a session otherwise open to the public.

98.   Because Plaintiff was distressed about Jantzen's

comments for the remainder of March 16 and uneasy about what had happened and about the possibility that the College would attempt to unlawfully expel or detain him, Plaintiff resolved to and did go to the North Newton police station the following morning (Saturday, March 17) before going to the campus, to seek clarification of his prospective status.

99.   Upon his arrival at the police station for the City of North Newton on the morning of March 17, Plaintiff for the first time met and subsequently talked with Officer Stovall, an employee of the City of North Newton police force, who indicated he was the officer on duty that day.

100.   During his conversation of the morning of March 17 with Officer Stovall, Plaintiff told Officer Stovall that in connection with his participation at the Conference at the nearby College, the College had called the police chief the previous day and that Chief Jordan had come to the campus.

101.   Plaintiff explained to Officer Stovall the circumstances of the police involvement and indicated that he believed that College officials might also try to deny him the right to participate in the Conference that morning.

102.   Plaintiff sought assurance from Officer Stovall that he would not be arrested if he attempted to assert his right to attend and remain at the Conference and if he was unable to persuade Conference Organizers of his existing right.

103.   Plaintiff believed that his right to be present at the Conference and thus on the campus the morning of March 17 was

still intact by virtue of his badge and paid registrant status and his belief that Sharp's lunch invitation was still standing and that Jantzen lacked authority to unilaterally revoke his registration and particularly without any effort to make Plaintiff whole.

104. Plaintiff also believed as of the morning of March 17 that Jantzen had neither purported to find him in trespass nor threatened him with trespass if he were to return.

105. During the amicable conversation that ensued with Officer Stovall, Officer Stovall told Plaintiff that if College officials called police that morning, that Plaintiff would not be arrested, but that College officials did have the right to order Plaintiff off the campus at the time officers were called, and that Plaintiff would at such time be given the opportunity to freely leave, upon penalty of arrest if he returned.

106. On information and belief, Officer Stovall never thereafter sought to communicate with or did communicate with North Newton Police Chief Jordan to confirm that Plaintiff had not already been ordered by him (or in his presence or with his knowledge) not to return to the campus on threat of arrest.

107. Instead, when Officer Stovall was called by Conference Organizers to the College campus later that morning to execute an arrest of Plaintiff, Officer Stovall accused Plaintiff of not giving him all the facts and stated that he had just learned that Plaintiff had already been "trespassed" the previous day, whereupon Plaintiff was arrested by Officer Stovall with the

support of law enforcement officers from the neighboring city of Newton, Kansas.

108. Although Plaintiff protested that the Officer had his facts wrong and indicated prior to being handcuffed that he had already disclosed to Officer Stovall the circumstances of the police calls, and that he was willing to simply leave the College campus as Officer Stovall had assured him he could do, Plaintiff was told he was not free to leave and that he would be arrested.

109. At no time did the arresting officers indicate they were willing to hear Plaintiff's narrative, or that anything Plaintiff said could possibly affect their predetermined decision to arrest Plaintiff.

110. Plaintiff's arrest was accomplished both by Officer Stovall acting on behalf of the City of North Newton, and by law enforcement officers of the neighboring City of Newton dressed in tactical gear.

111. Once Plaintiff acknowledged that he was not free to leave, and notwithstanding Plaintiff's peaceable demeanor and statement that he would not resist arrest, Plaintiff had his hands cuffed behind his back against his wishes and was forced into an uncomfortable position in the rear seat of a vehicle where he had no range of movement and had begun to worry about losing circulation in his hands by the time of the arrival of the vehicle at the Harvey County Detention Center.

112. On information and belief, Plaintiff's arrest was at the behest of and based on information given to Officer Stovall

by Conference Organizers or one of them, or College officials acting on behalf of or at the behest of Conference Organizers or one of them.

113. On information and belief, Conference Organizers or their representative or representatives gave false information about Plaintiff to Officer Stovall and/or to neighboring law enforcement officers acting for the City of North Newton in Plaintiff's arrest, before Plaintiff's arrest, namely that Plaintiff had appeared on the campus that morning in defiance of a prior warning issued to him on March 16 that he would be trespassing if he did.

114. Plaintiff believed he had the right to be present at the Conference and thus on the Bethel College campus when he entered the building where the Conference sessions were scheduled on the morning of March 17.

115. At no time after entering the building where Conference sessions were scheduled on the morning of March 17 did Plaintiff leave upon threat of being arrested if he returned.

116. At no time after entering the building where Conference sessions were scheduled on the morning of March 17 did Plaintiff leave that building until he was removed from the building in handcuffs.

117. At no time as of his arrest March 17 or prior thereto had Plaintiff failed to meet any of the conditions that were the necessary predicates for his remaining free from arrest, as explained to him by Officer Stovall earlier that morning.

118.   Plaintiff at no time believed that he had been told not to return to the campus prior to appearing at the Conference session the morning of March 17.

119.   Plaintiff in fact had been told on March 16 by a representative of the Conference Organizers, John Sharp, that Sharp would meet with him on campus during the lunch hour on March 17.

120.   Plaintiff entered the building where the Conference sessions were scheduled the morning of March 17 in order to participate in the Conference sessions.

121.   Plaintiff also appeared for the Conference on the morning of March 17 anticipating and expecting the opportunity to meet with John Sharp at noon, on campus per Sharp's invitation, to discuss Plaintiff's concerns regarding "Mennonites and the Holocaust."

122.   At no time the morning of March 17 before he was arrested did Plaintiff have any motivation or desire to be arrested or any knowledge that he could be if he adhered to the conditions declared to him by Officer Stovall.

123.   At all times on March 17 before being told he would be arrested, Plaintiff believed he had the right to be present on the campus by virtue of his unrevoked registration and invitation from one of the Conference Organizers to meet him during lunch.

124.   Plaintiff arrived on the Bethel College campus the morning of March 17 with the additional knowledge that he had confirmed with North Newton police that very morning that if his

participation at the Conference was challenged, he would be given a warning by police to leave the campus rather than be arrested, and that he would be allowed to freely leave, and that he would be subject to arrest only if he thereafter returned.

125.  As a consequence of his arrest, Plaintiff was jailed for 18 hours in a holding cell at the Harvey County Detention Center.

126.  As a consequence of his arrest, Plaintiff was fingerprinted and his arrest record became a public record.

127.  As a consequence of his arrest, Harvey County authorities took a "mug shot" photo of Plaintiff that is now available for viewing on the worldwide web by anyone searching Plaintiff's name.

128.  Plaintiff confirmed with Chief Randy Jordan after Plaintiff's release from jail, on a visit to the North Newton police station on Monday, March 19, that Chief Jordan had not "trespassed" him on Friday, March 16 and that he was not aware of any trespass warning given by Conference Organizers or College to Plaintiff that date.

129.  On or about April 19, 2018, Plaintiff was informed by the a prosecutor representing the City of North Newton that he would not be prosecuted for any crime.

130.  Despite Plaintiff's efforts after his release from jail to seek accountability and a remedy from the chairman of the board of College, an individual known personally to Plaintiff and an appointee to the College board from the regional conference of

MCUSA that Plaintiff is also affiliated with, Plaintiff has been offered no avenue for obtaining accountability of Conference Organizers or Bethel or MCUSA or any comprehensive remedy.

131. Plaintiff rejected and refused to endorse a $100 check sent to him after the Conference without explanation by College.

WHEREFORE, Plaintiff seeks relief as follows:

## FIRST CAUSE OF ACTION
### MONEY DAMAGES FOR BREACH OF CONTRACT/LICENSE AGREEMENT
### BETHEL COLLEGE & MCUSA

132. Plaintiff refers to the allegations appearing in Paragraphs 1 through 131 above and hereby incorporates those allegations herein by reference as though they were set forth in full.

133. Upon acceptance of Plaintiff's registration fee and no later than the time that Conference Organizers and specifically Defendants College and MCUSA gave Plaintiff a Conference badge and materials, a contract was formed between Plaintiff and Conference Organizers as a joint venture, as to which Defendants College and MCUSA had liability as joint venturers or partners, pursuant to which Plaintiff had the right to participate in the Conference and be present for all sessions of the Conference that were otherwise closed to the public.

134. Upon acceptance of Plaintiff's registration fee and no later than the time that Conference Organizers and specifically Defendants College and MCUSA gave Plaintiff a Conference badge

and materials, a license agreement was formed between Plaintiff and at least Defendants MCUSA and College under which Plaintiff had the right to participate in the Conference and be present on the campus of the College for all sessions of the Conference that were otherwise closed to the public.

135. Plaintiff provided Conference Organizer Defendants with the only consideration requested by or necessary to Conference Organizer Defendants to create the contract or license agreement, namely his $100 registration fee.

136. Plaintiff either had performed or was willing to perform all terms and conditions of the contract or agreement formed between Plaintiff and Conference Organizers, on which Defendants MCUSA and College stood liable as joint venturers, as of the time that Conference Organizers and specifically Defendants MCUSA and College breached the contract or agreement.

137. Plaintiff had not violated any term of the contract or license agreement known to Plaintiff as of the time that Conference Organizers, and specifically Defendants MCUSA and College as the constituent entities of the joint enterprise Conference Organizers, breached the contract or agreement.

138. Conference Organizers Defendants MCUSA and College breached the contract with Plaintiff by telling him the evening of March 16, without giving him recourse, that he was excluded from the remainder of the Conference.

139. Defendants MCUSA and College breached the contract with Plaintiff by telling him on the morning of March 17 that he

was trespassing on the campus, despite Plaintiff having fulfilled all the terms of the contract under which he owed obligations to the Conference Organizers and despite the fact that Plaintiff had not violated any terms established prior to the Conference for participation in the Conference.

140. Alternatively to or in addition to the contentions set forth in Paragraph 138 and 139 above, Conference Organizers and specifically Defendants MCUSA and College breached the contract with Plaintiff by telling him and by telling law enforcement officers on the morning of March 17, without giving him recourse and without purporting to cancel the meeting to which Plaintiff had been invited by Conference Organizer representative Sharp, that he was trespassing on the property of the College thus precluding him from participating in the rest of the Conference.

141. Alternatively to the contentions set forth in Paragraphs 138 through 140 above, Conference Organizers and specifically Defendants MCUSA and College breached the license agreement with Plaintiff by telling him the evening of March 16, without giving him recourse, that he was excluded from the remainder of the Conference.

142. Alternatively to the contentions set forth in Paragraphs 138 through 140 above, and alternatively to or in addition to the contention set forth in Paragraph 141 above, Defendants MCUSA and College breached the license agreement with Plaintiff by telling him on the morning of March 17 that he was trespassing on the campus, despite Plaintiff having fulfilled all

the terms of the license agreement and despite not having violated any terms established prior to the Conference for participation in the Conference.

143. Alternatively to the contentions set forth in Paragraphs 138 through 140 above, and alternatively to or in addition to the contention set forth in Paragraph 141 above, Conference Organizers and specifically Defendants MCUSA and College breached the license agreement with Plaintiff by telling him and advising law enforcement officers on the morning of March 17, without giving him recourse, and particularly without purporting to cancel his planned meeting with Conference Organizers' representative Sharp, that he was trespassing on the property of the College thus precluding him from participating in the remainder of the Conference.

144. As a result of the breach as described in any of the paragraphs 138 through 143 above, Plaintiff suffered damages in the form of the loss of the value of his registration fee, travel and lodging expenses, purchases and printing and publicity expense all of which he had incurred in the reasonable expectation that the contract or license agreement would be fully performed by Conference Organizers and MCUSA and College, with a value of not less than $1,500 according to proof.

145. As a result of the breach as described in any of the paragraphs 138 through 143 above, Plaintiff also suffered damages consisting of the revenue that he sacrificed in order to be able

/////

to fully attend and participate in the Conference, with a value of not less than $2,500 according to proof.

146. As a result of the breach as described in any of the paragraphs 138 through 143 above, Plaintiff also suffered consequential damages in the form of being labeled a trespasser and arrested, and subjected to imprisonment, as set forth in more detail in the pleadings below, with a value of not less than $500,000, subject to proof.

147. Alternatively to the contention set forth in Paragraph 146 above, as a result of the breach as described in any of the paragraphs 138 through 143 above, Plaintiff suffered consequential damages in the form of false arrest and false imprisonment, as set forth in more detail in the pleadings below, with a value of not less than $500,000, subject to proof.

148. It was reasonably foreseeable by College and MCUSA that if they breached the contract with Plaintiff, Plaintiff would suffer the damages that he in fact suffered, as set forth in more detail in the pleadings below, with a value of not less than $500,000, subject to proof.

149. The injury suffered by Plaintiff as a result of the arrest and imprisonment instigated by College and MCUSA on March 17 has included damage to the reputation of Plaintiff as a consequence of information available to the public about Plaintiff's arrest record.

150. The injury suffered by Plaintiff as a result of the arrest and imprisonment instigated by College and MCUSA on March

17 includes the loss of work for Plaintiff as a lawyer and a diminution in the profitability of Plaintiff's law practice as a consequence of Plaintiff's false arrest and false imprisonment and information now available to the public about Plaintiff's arrest record.

151.  On information and belief, the injury suffered by Plaintiff as a result of the false arrest and imprisonment instigated by Defendants College and MCUSA on March 17 includes difficulties in relationships and broken relationships including breaks in relationships with relatives with whom Plaintiff was once close.

152.  Plaintiff has suffered damages to his reputation from being falsely arrested and falsely imprisoned in the amount of $100,000, over and above the damages suffered as a direct result of his false arrest and imprisonment, subject to proof.

153.  The breach of contract or license agreement by Conference Organizers, including Defendants College and MCUSA, was the direct and proximate cause of all of Plaintiff's injuries set forth above and as more specifically detailed below.

WHEREFORE, Plaintiff requests relief as hereinafter set forth.

SECOND CAUSE OF ACTION

MONEY DAMAGES FOR INTENTIONAL TORT - FALSE ARREST

BETHEL COLLEGE & MCUSA

154.  Plaintiff refers to the allegations appearing in

Paragraphs 1 through 153 above and hereby incorporates those allegations herein by reference as though they were set forth in full.

155. Defendants College and MCUSA in their capacity as of Conference Organizers acted intentionally to deprive Plaintiff of his freedom and liberty, knowing they had no good cause to do so, by making a false or incomplete report to law enforcement officers on the morning of March 17, 2018 leading to the arrest and imprisonment of Plaintiff.

156. Alternatively to the contention in Paragraph 155 above, Defendants College and MCUSA in their capacity as of Conference Organizers acted intentionally to cause College to deprive Plaintiff of his freedom and liberty, knowing they had no good cause to do so, by instructing or allowing College to make a false or incomplete report to law enforcement officers on the morning of March 17, 2018 leading to the arrest and imprisonment of Plaintiff.

157. Defendants College and MCUSA knew when making their false report to law enforcement officers or instructing or allowing it to be made on the morning of March 17, 2018, namely that Plaintiff was trespassing on College property, and by not retracting it upon being told that Plaintiff was on the campus partly in response to the specific invitation of a representative of Conference Organizers, that this would lead to the arrest of Plaintiff.

158. Plaintiff was not free to leave the College property

at any time after Defendants College and MCUSA had made their false report to law enforcement officers or instructed or allowed the report to be made.

159.  As a direct consequence of the false report made by Defendants College and MCUSA to law enforcement officers whether directly or upon their instruction or permission, Plaintiff was falsely arrested and subsequently held in jail for 18 hours.

160.  Defendants College and MCUSA each acted with malice, recklessness and callous disregard and indifference toward Plaintiff in causing his false arrest and imprisonment.

161.  Plaintiff has suffered damages in the amount of no less than $600,000 as a consequence of the loss of his freedom and liberty, personal humiliation and impairment to his reputation caused by his false arrest and false imprisonment.

162.  Plaintiff has thus far suffered consequential damages resulting from the false arrest and imprisonment instigated by College and MCUSA on March 17 consisting of loss of work and loss in profitability of his law practice in the amount of $50,000, over and above the damages suffered as a direct result of his false arrest and imprisonment, subject to proof.

WHEREFORE, Plaintiff requests relief as hereinafter set forth.

/////

/////

/////

/////

THIRD CAUSE OF ACTION

MONEY DAMAGES AND DECLARATORY RELIEF

FALSE ARREST AND FALSE IMPRISONMENT

CITY OF NORTH NEWTON

163.   Plaintiff refers to the allegations appearing in Paragraphs 1 through 162 above and hereby incorporates those allegations herein by reference as though they were set forth in full.

164.   On the morning of March 17, 2018, Defendant City of North Newton, Kansas arrested Plaintiff for trespassing without having good and adequate cause to do so.

165.   On the morning of March 17, 2018, Defendant City of North Newton, Kansas arrested Plaintiff for trespassing without having a legal basis for the arrest.

166.   On the morning of March 17, 2018, Defendant City of North Newton, Kansas arrested Plaintiff for trespassing despite the fact that Plaintiff was not in fact trespassing.

167.   On the morning of March 17, 2018, Defendant City of North Newton, Kansas arrested Plaintiff for trespassing despite having told Plaintiff that they would not do so under the conditions under which he was arrested.

168.   Defendant City of North Newton, Kansas effectively induced Plaintiff to be present on the College campus the morning of March 17, 2018 by assuring him that if College officials called for his arrest, that he would be warned to leave and could leave freely upon penalty of arrest if he returned.

169.   Defendant City of North Newton, Kansas failed to do a proper investigation of the facts before the false arrest of Plaintiff.

170.   Defendant City of North Newton, Kansas failed to investigate the contentions of Plaintiff that he was properly on the College campus before falsely arresting him.

171.   As a direct consequence of his false arrest, and at the behest of City of North Newton, Kansas, Plaintiff was falsely imprisoned and held at the Harvey County Detention Center against his will for 18 hours after his false arrest.

172.   Plaintiff was not free to leave the College property at any time the morning of March 17, 2018 after Defendant City of North Newton, Kansas and City of Newton officers appeared at the College to arrest him.

173.   Defendant City of North Newton, Kansas acted with malice, recklessness and callous disregard and indifference toward Plaintiff in falsely arresting him and causing his false imprisonment.

174.   Plaintiff has suffered damages in the amount of no less than $600,000 as a consequence of the loss of his freedom and liberty, personal humiliation and impairment to his reputation caused by his false arrest by the City of North Newton, Kansas leading to his false imprisonment.

175.   Plaintiff has thus far suffered consequential damages resulting from his false arrest by City of North Newton and imprisonment resulting therefrom, consisting of loss of work and

loss in profitability of his law practice in the amount of $50,000, over and above the damages suffered as a direct result of his false arrest and imprisonment, according to proof.

176.  On July 17, 2019, Plaintiff submitted a claim for his damages to the City of North Newton consisting of the allegations made in the predecessor complaint, a true and correct copy of which is attached hereto as Exhibit A (without the copy of the Complaint which is on file herein) (the "Claim").

177.  Defendant City of North Newton has not acted on the Claim, and since more than 120 days have passed after its presentment to the City, it is deemed denied.

178.  In submitting the Claim and allowing the City of North Newton opportunity to satisfy it without litigating it, and asserting this cause of action more than 120 days after the administrative submission of the Claim, Plaintiff has complied with the substance of and in the spirit of the requirements of the Kansas Tort Claims Act including K.S.A. 12-105b.

WHEREFORE, Plaintiff requests relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### MONEY DAMAGES FOR VIOLATION OF FEDERAL CIVIL RIGHTS

### 42 U.S.C. Section 1983

### CITY OF NORTH NEWTON, KANSAS

179.  Plaintiff refers to the allegations appearing in Paragraphs 1 through 178 above and hereby incorporates those

allegations herein by reference as though they were set forth in full.

180.   Plaintiff was deprived by the City of North Newton, Kansas of his constitutionally-guaranteed right of liberty by being subjected to false arrest on March 17, 2018.

181.   Plaintiff was deprived by the City of North Newton, Kansas of his constitutionally-guaranteed right of liberty by being subjected to false imprisonment on March 17 extending to March 18, 2018.

182.   Neither Plaintiff's arrest or imprisonment had any legal basis under Kansas law.

183.   The City of North Newton, Kansas was acting under color of state law when it subjected Plaintiff to false arrest.

184.   The City of North Newton, Kansas was acting under color of state law when it subjected Plaintiff to false imprisonment.

185.   On March 17, 2019, on information and belief, the City of North Newton was told by Conference Organizers that the individual who had previously been labeled as disruptive by Conference Organizers posed such a threat to the Conference that he had been declared a trespasser, and that he had returned to the campus notwithstanding the warning.

186.   On March 17, 2019, on information and belief, the City of North Newton was told or led to believe by Conference Organizers that Plaintiff was a dangerous person with dangerous opinions who posed a security threat to Conference-goers.

187.   The City of North Newton uncritically accepted the narrative of Conference Organizers conveyed through its largest employer, Bethel College, regarding the risk posed by Plaintiff.

188.   In making a false arrest of Plaintiff, Defendant City of North Newton, Kansas arbitrarily chose to believe the most prominent citizen and employer in the City, Bethel College, and to not credit the narrative of Plaintiff, despite having told Plaintiff that his narrative would be credited if College officials called for his arrest the morning of March 17, 2018.

189.   In arresting Plaintiff, Defendant City of North Newton followed a custom and practice which, although not authorized by written law or any explicit municipal policy, is so permanent and well settled as to constitute a custom and usage that has the force of law.

190.   The custom and practice followed by Defendant City of North Newton in arresting Plaintiff is a custom and practice within that small City of catering to and giving a controlling voice to the security and anxiety narratives of its largest employers to the exclusion of any reasonable attempt or good faith willingness to determine whether a crime has been committed or to first hear narratives of those accused by these employers.

191.   The custom and practice of the City of North Newton with regard to arrests of those who are said by the City's largest employers to constitute some sort of security threat to the operations of the employers is to arrest the accused individual with a show of force without due regard to whether the

individual has been rightly accused of a crime and without inquiry into whether the individual was engaged in nothing more than constitutionally-protected activity before the alleged commission of a crime.

192.   Plaintiff is aware of one or more other instances where Defendant City of North Newton has, at the behest of one of its large employers, arrested an individual engaged in constitutionally protected activity on the strength of the narrative of the employer, without just cause and without any interest in crediting the narrative of the accused, that this individual posed a risk to the security of the employer's operations or employees.

193.   Plaintiff is aware of one or more instances where, in arresting individuals at the request of its largest employers for crimes said to be related to the individual's speech, the City of North Newton has descended on the individual with a show of force of numerous officers and has recruited heavily armed officers from neighboring jurisdictions to do so, and has ventured into other jurisdictions to arrest the individual.

194.   Plaintiff is aware of at least one individual who was informed of Plaintiff's arrest, in this case a minister and long-time resident of a nearby community, who without any prompting or coaching by Plaintiff and without knowing of any requirements for a claim against City of North Newton described the custom and practice of the City of North Newton substantially in these terms, "You know, this is a small town and when a major employer

calls the police and says someone has violated the law and should be arrested, that is what the police will do."

195. In the case of Plaintiff, the City of North Newton by the time of Plaintiff's arrest had been told that Plaintiff held dangerous views and that he either had disrupted the Conference or posed a significant risk of doing so, and the City of North Newton acted thereon and implemented its standard custom and practice when it arrested Plaintiff the morning of March 17, 2018 based on preconceived intent to arrest and without willingness to hear a complete explanation from Plaintiff as to why he was not trespassing, and solely on the statements made by Defendant College acting on behalf of Conference Organizers.

196. But for the practice and custom used by the City of North Newton in responding to security-related complaints of its largest employers, Plaintiff would not have been arrested.

197. By violating Plaintiff's civil rights through subjecting Plaintiff to false arrest, the City of North Newton acted maliciously, recklessly and with callous indifference and disregard for Plaintiff's protected rights.

198. By violating Plaintiff's civil rights through subjecting Plaintiff to false imprisonment, the City of North Newton acted maliciously, and recklessly and with callous indifference and disregard for Plaintiff's protected rights.

199. The City of North Newton is not immune from suit under the Eleventh Amendment.

200. As a consequence of the violation of Plaintiff's

federal civil rights by City of North Newton, Kansas and the arrest and imprisonment to which Plaintiff was wrongfully subjected, Plaintiff suffered damages in the form of physical pain and suffering and emotional distress, including but not limited to personal humiliation and impairment to his reputation, having a value in the amount of $600,000.

201.    As a further consequence of the violation of Plaintiff's federal civil rights by City of North Newton, Kansas, and the arrest and imprisonment to which Plaintiff was wrongfully subjected, Plaintiff has thus far suffered consequential damages resulting from his false arrest by City of North Newton and imprisonment resulting therefrom, consisting of loss of work and loss in profitability of his law practice in the amount of $50,000, over and above the damages suffered as a direct result of his false arrest and imprisonment, subject to proof.

WHEREFORE, Plaintiff requests the following relief:

## PRAYER FOR RELIEF

1.    On either his first or second causes of action, Plaintiff requests that the Court order a money judgment in Plaintiff's favor against College and MCUSA jointly and severally in the amount of $654,100; and

2.    In addition to the damages awarded under the foregoing paragraph, Plaintiff requests that to the extent that judgment is entered on the second cause of action the Court also order the

recovery of punitive damages by Plaintiff against College and MCUSA respectively and severally, subject to proof;

3.   On his third cause of action, Plaintiff requests that the Court order a money judgment in favor of Plaintiff against City of North Newton, Kansas over and above any judgment awarded against other Defendants in the amount of $500,000, plus $150,000 jointly and severally with Defendants Bethel College and MCUSA for damages associated with Plaintiff's loss of reputation and loss of revenue to the extent said damages are awarded under either of the first or second causes of action against those Defendants or either of them;

4.   In addition to the damages awarded under the foregoing paragraph, Plaintiff requests that the Court order punitive damages on his third cause of action against City of North Newton, subject to proof;

5.   On his third cause of action, Plaintiff also requests that the Court grant declaratory relief or an injunction as necessary eliminating the arrest record of Plaintiff from all State of Kansas and publicly available databases and that City of North Newton, Kansas be directed to take all steps necessary to accomplish the elimination of any record of Plaintiff's false arrest from any database whether controlled by City of North Newton or otherwise; and

6.   On his fourth cause of action, in the alternative to the relief requested under Prayer for Relief Paragraph 4, Plaintiff requests that the Court award a money judgment in favor of

Plaintiff against City of North Newton, Kansas over and above any judgment awarded against other Defendants in the amount of $500,000, plus $150,000 jointly and severally with Defendants Bethel College and MCUSA to the extent said damages associated with Plaintiff's loss of reputation and loss of revenue are awarded against those Defendants or either of them under either of the first two causes of action, for the violation of Plaintiff's federal civil rights; and

7. In addition to the damages awarded under the foregoing paragraph, Plaintiff requests that the Court order punitive damages on his fourth cause of action against City of North Newton, subject to proof; and

8. Plaintiff requests such other and further relief as the Court may deem just and proper.

Date: _____     _____
                              BRUCE LEICHTY, PLAINTIFF, IN PRO PER

DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Wichita, Kansas as the location for the trial in this matter.

Date: _____     _____
                              BRUCE LEICHTY, PLAINTIFF, IN PRO PER

# EXHIBIT 1

Bruce Leichty
c/o Bruce Leichty, A Prof. Corp., 220 W. Grand Ave.
Escondido, CA 92025 * (760) 484-2467 (cell)

July 18, 2019

BY CERTIFIED MAIL - RETURN RECEIPT REQUESTED

City of North Newton
2601 North Main Street
P. O. Box 87
North Newton, KS 67117

Re: Claim for Money Damages of $500,000 For False Arrest
Leading to False Imprisonment, Bruce Leichty

Dear sirs/madams:

Pursuant to Kansas law, here is written notice under Section 12-105b(d) of my claim for $500,000 against the City of North Newton arising out of my arrest on March 17, 2018:

1. Name and address of Claimant: Bruce Leichty, c/o Bruce Leichty, A Prof. Corp., 220 W. Grand Avenue, Escondido, CA 92025; no attorney at present.

2. The factual basis for the claim is detailed in the accompanying Complaint, filed in Wichita federal court on March 15, 2019. Essentially, the claim is being made because I was arrested March 17, 2018 as a trespasser on the campus of Bethel College when in fact I was a registrant at a conference there, and an invited guest, not guilty of trespass, in violation of the City's own policy under which I was to have been given a warning to leave, upon threat of arrest if I returned. More details are available in the Complaint.

3. Names of the officers involved: Randy Jordan, Donald Stovall. Addresses not known.

4. The injury I suffered was the deprivation of my constitutional right to liberty from the time of my arrest until some 19 hours later when I was released from the Harvey County Detention Center, plus emotional distress; more details are provided in the accompanying Complaint.

5. Monetary damages requested: $500,000.

Please note that I will be asking the federal district court to allow this claim to be processed and paid and to enforce the time for its consideration under K.S.A. Section 12-105b notwithstanding the fact that it was not filed in accordance with Section 12-105b. In such fashion I intend to abide by the spirit of Kansas tort law even if not the letter (which is now impossible). I await acknowledgement and processing of this claim by the City and a determination thereon.

Sincerely,

Bruce Leichty

enclosure: Complaint