UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRUCE LEICHTY,                          )
                                        )
                    Plaintiff,          )
                                        )
vs.                                     )        Case No. 19-CV-01064-JWB-KGG
                                        )
BETHEL COLLEGE,                         )
                                        )
                    Defendants.         )
_____ )

**DEFENDANT BETHEL COLLEGE'S MEMORANDUM IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

COME NOW Defendant Bethel College, by and through counsel Corey M. Adams and

Scott E. Sanders of McDonald Tinker PA, and in support of its Motion for Summary Judgment

filed herein, files this memorandum in support. For the reasons stated herein, Defendant's motion

should be granted.

**STATEMENT OF UNCONTROVERTED FACTS**

1.      Plaintiff has been an opponent to the Mennonite Church USA resolution

regarding the contemporary Palestine/Israeli conflict. (Exhibit A, Bruce Leichty Deposition, pp.

27-32).

2.      In 2017, Mennonite Church USA held a national annual conference. (*Id*. at pp.

27-28).

3.      One of the topics at the 2017 national conference was to discuss the passing of a

resolution relating to the contemporary Palestine/Israeli conflict. Plaintiff felt a "particular

burden" to attend the meeting to protest the passing of the resolution. (*Id*. at 27-32).

4.      Plaintiff believed that:

…The general tone of it was that we need to repent for being anti-Semitic as a Mennonite Church. And I did not believe that there was any significant history of anti-Semitism in the American Mennonite Church and, in fact, I think it was probably the opposite. So I just felt like there was some agenda here -- well, and then there were also statements made about the -- I guess -- I think there was a statement made about the importance of the Holocaust to our theology -- I'm not certain of that -- which I took issue with, as well, because that had never been really a function of Christian theology or Mennonite teachings.

(*Id*. at p. 29).

5.      During the 2017 conference, Plaintiff was both threatened with removal from the conference and arrest when he refused to discontinue passing out controversial literature and protesting the passing of the resolution. (*Id*. at pp. 32-34).

6.      Following Plaintiff's threatened arrest and ouster from the 2017 conference, he never returned to another Mennonite Church USA annual conference. (*Id*. at pp. 36-37).

7.      Bethel College scheduled a conference titled "Mennonites and the Holocaust" for March 16-17, 2018. (Exhibit B, Mennonites and the Holocaust Brochure).

8.      Generally, the Bethel College conference "aim[ed] to document, publicize, and analyze Mennonite attitudes, environments, and interactions with others in Europe during the 1930s and 1940s that shaped their responses to and engagement with Nazi ideology and the events of the Holocaust." (*Id*.)

9.      Plaintiff timely pre-registered for the Bethel College conference titled "Mennonites and the Holocaust" by submitting information requested of him and paying a $100 registration fee. (Doc. 146, Stipulation No. 3).

10.      Plaintiff understood that the Bethel College conference organizers could, "broadly speaking," run the conference the way that they wanted and that conference attendees should comply with the rules and regulations of the conference. (Exhibit A, pp.171-176).

11.     Additionally, Plaintiff planned to moderate an event he organized at a nearby community room in North Newton on the evening of March 16, 2018. (Exhibit C, Leichty Flier).

12.     The purpose of Plaintiff's event was to examine revisionist history regarding the Holocaust. (*Id*.; Exhibit A, pp. 72-73).

13.     The main speakers of Plaintiff's event were extremely pro-Palestine in the contemporary Palestine/Israeli conflict. Plaintiff knew this:

Q.     Did you ask them what their views on the Holocaust were?

A.     I think, once they arrived to Kansas, we may have talked about it a little bit, but the main thing that I knew about them, I think, was part of my concern, as well, and that is that the Holocaust was being exploited in modern day America as kind of a get out of jail free card. That's probably a bad way to say it. As a kind of a -- as a carte blanche, if you will, for all sorts of conduct by -- whether it be Israel or Zionists or other elite Judaics that they would trot out the anti-Semitism/Holocaust card whenever it was convenient. So I knew -- I was pretty sure they shared that belief, and that was the critical belief because I thought that the Mennonite Church was being used in that same respect.

Q.     Did you know that Henry Herskovitz was pro Palestine in the modern day Palestine/Israeli conflict?

A.     I knew both of them were extremely pro Palestinian, yes.

(Exhibit A, pp. 105-106).

14.     Prior to the beginning of the Bethel College conference, Plaintiff reached out to Paul Schrag who is an editor and publisher for the Mennonite World Review (now called Anabaptist World), an independent journalistic ministry based in Kansas. (Exhibit D, Paul Schrag Deposition, pp. 10, 57-67; Exhibit A, pp. 88-89).

15.     Plaintiff requested that a classified advertisement regarding his organized event at the community room be published in the March 12, 2018 issue of the Mennonite World Review. (Exhibit D, pp. 10, 57-67; Exhibit A, pp. 88-89).

16.     Mr. Schrag rejected the ad, and he emailed the co-organizers for the Bethel

College conference, John Sharp (Hesston College employee), John Thiesen (Bethel College employee), and Mark Jantzen (Bethel College employee) to inform them of Plaintiff's intent to hold an event during the evening of their scheduled conference. (Exhibit D, pp. 10, 57-67; Exhibit A, pp. 88-89).

17.     In the email, Mr. Schrag both informed them of the proposed event organized by Plaintiff and provided them with a pamphlet that Plaintiff had given to Mr. Schrag which explained holocaust revisionism views. (Exhibit A, pp. 93-94; Exhibit D, March 6, 2018 Email with Attachment).

18.     Knowing that Plaintiff had planned to host his own event, the co-organizers of the Bethel College conference began planning on how to address attendees, including Plaintiff, regarding the passing out of literature at the conference. (Exhibit E, November 8, 2019 Email; Exhibit F, March 13, 2018 Email).

19.     That planning included conversations between Lori Livengood, Bethel College's Vice-President of Marketing and Communications, and the North Newton Police Department. (*Id.*).

20.     On the first day of the Bethel College conference, March 16, 2018, Plaintiff signed in for the conference. (Exhibit A, pp. 134-135).

21.     Plaintiff brought the two speakers cheduled for his event to the Bethel College conference. (*Id.*).

22.     Neither of Plaintiff's speakers had pre-registered for the conference. (*Id.* at p. 138).

23.     These two individuals were denied access to the conference because they failed to pre-register. (*Id.* at pp. 134-138).

24.     After checking in for the conference, Plaintiff immediately began passing out flyers advertising his event scheduled for that evening. (*Id*. at 145-146).

25.     Plaintiff was asked by Dr. Robert Milliman, Vice-President of Academic Affairs at Bethel College, to stop passing out flyers and pamphlets. (*Id*. at 146-148; Exhibit G, Robert Milliman Deposition, pp. 33-34).

26.     Plaintiff protested Dr. Milliman's request and only stopped passing out the fliers when police were called. (Exhibit G, pp. 35-44).

27.     Once the police were called, Plaintiff returned the flyers to his vehicle, and Bethel College did not witness him passing out the flyers for the remainder of the day. (*Id*.).

28.     During the last seminar of the day on March 16, 2018, at the Bethel College conference, Plaintiff requested to speak during the questions and answers portion of the session. (Exhibit A, pp. 154-157).

29.     In response to Plaintiff's request, Dr. Jantzen directed Plaintiff to keep his question or comment on topic. (*Id*. at p. 168; Exhibit H, Mark Jantzen Deposition, pp. 141-142, Exhibit I, Video of Final Session on March 16, 2018).

30.     Instead, Plaintiff made announcements regarding his evening event titled "Two Revisionist Jews Consider the Holocaust." (*Id*. at pp.156-157; Exhibit C).

31.     When Plaintiff began making announcement regarding his event, Dr. Jantzen requested that Plaintiff stop announcing his event and return the microphone. (Exhibit A, pp. 168, Exhibit H, pp. 141-142; Exhibit I).

32.     Many conference attendees were audibly upset by Plaintiff's announcement. (Exhibit I).

33.     Dr. Jantzen threatened to contact the police if Plaintiff did not stop speaking.

Plaintiff did not stop speaking for several moments, but eventually stopped speaking and left the room after Dr. Jantzen called the police. (Exhibit A, pp. 184-187; Exhibit H, pp. 141-142; Exhibit I).

34.    Upon arrival, Newton police officers asked Dr. Jantzen if Bethel College wanted to press charges for trespassing. Dr. Jantzen told the police that he just wanted to "let it go." (Exhibit I, p. 142).

35.    Later that evening, Dr. Jantzen informed Plaintiff that he was not allowed to come back to the Bethel College conference. (Exhibit J, March 16, 2018 Email; Exhibit A, pp. 189, 196).

36.    In an email sent by Dr. Jantzen on March 16, 2018 at 9:52 pm to John Sharp (co-organizer and former employee of Hesston College), Jonathan Gering (President of Bethel College), Robert Milliman (Vice President of Academic Affairs of Bethel College), John Thiesen (co-organizer and employee of Bethel College), and Allen Wedel (Vice-President of Business Affairs), Dr. Jantzen stated that:

> At the end [Bruce] asked if he could come back tomorrow and I said no and that I would call the police again. He said then he would have to be arrested. If anyone would be available to help tomorrow between 8 and 9 that would be great. And do you have advice about trespassing charges?

(Exhibit J).

37.    Early in the morning on March 17, 2018, Plaintiff emailed Bethel College officials, stating that he believed he had the right to return to the conference, and that he would not be trespassing if he returned. (Exhibit K, March 17, 2018 Email).

38.    Plaintiff knew that if he returned to campus, following the statements made by Dr. Jantzen, that he may be trespassing, or that Bethel College representatives would consider him trespassing, and that he may be arrested as a result:

Q.      So I'll show you this e-mail. You were not cc'd on it or a recipient of it, but I want to ask you questions about what's mentioned by Dr. Jantzen. So this is an e-mail sent by Dr. Jantzen on March 16th, 2018. We've marked it as Exhibit F, bates number BC 1698. On the e-mail sent by Dr. Jantzen at 9:52 on March 16th, it says: "I removed Bruce from the auditorium this afternoon a little before 5:00. Since he left after a little bit of shouting, when the police arrived, I said, let it go, although they asked if he should be charged with trespassing." So the first question is that you were not arrested on the 16th, were you?

A.       I was not.

Q.      You were not charged with any sort of trespassing or anything like that on the 16th?

A.      Nobody mentioned a word to me at all on the 16th.

Q.      If nobody used the word trespassing with you, why did you believe that trespassing was a -- that you were, potentially, trespassing on property?

A.      I didn't, at least to my knowledge. When I went to the police the next day, I don't believe -- I believe it was they who brought up the possibility of trespass. I could be wrong but --

Q.      I'm going to show you what -- can we mark this as an exhibit. So Exhibit G is an e-mail that was sent by you to John Thiesen. It cc's John Sharp and Mark Jantzen and blind carbon copies Henry and Daniel. I'm assuming that that's their e-mail addresses; correct?

A.      Yes.

Q.      And this is an e-mail sent at 5:28 in the morning pacific time, so that would be what 7:28 in the morning central time?

A.      I guess so.

Q.      So we had just seen the text message that you had sent, which purported to be at about 8:25 or 8:23, somewhere around there. Do you have any reason -- I mean, we can pull that text message up again.

A.      That's my recollection 8:23.

Q.      And you said that you were going to go stop by to see if Randy

Jordan was there at around that time; correct?

A.      Yes.

Q.      And so you would have gone to the police department after that text message was sent; correct?

A.      Yes.

Q.      And so that was your conversation with police officers in asking them -- well, after Dr. Jantzen -- I think you testified to this earlier: Dr. Jantzen told you that you were "out of the conference." And I asked you whether you went to police officers that evening and you said that they were probably gone so you did not go to them that evening; correct?

A.      I did not.

Q.      And you did not go to them -- it wasn't until about 8:25-ish that you would have gone to the police department; correct?

A.      Correct.

Q.      And so this e-mail was sent prior to you ever talking to police officers, and so I'll direct your attention to the third paragraph there and it says: "I've reviewed the Kansas criminal trespass statute and believe it is clear that I was authorized to be present when I paid my fee for the conference covering both days."

A.      I do see that.

Q.      So where would you have come up with the word trespassing then?

A.      Well, I think my testimony was that I had not heard the word used on March 16th.

Q.      So you just came up with the word?

A.      I think I was concerned, obviously, when I was told I was out of the conference whether the next thing to happen would be that if I reappeared at the conference I would be accused of trespassing. So I did do some looking into it, yeah.

Q.      So your testimony is that without anybody telling you that you were, in fact, trespassing, you did have concerns that you might be trespassing?

A.      No, I didn't -- well, I didn't know the law. This is not one of my areas that I'd ever had to look into. My concern was that if -- because, I think, Mark Jantzen had told me the police would be called if I came back to the conference that then the next thing to happen might be that I would be charged with trespassing. And I didn't believe that I would be or I should be because I thought it was a civil matter, but I wanted to review the Kansas trespass statute to try to confirm what I believed to be the case.

Q.      But nobody mentioned -- is it your testimony that nobody mentioned to you that you were in any danger of being arrested for "trespassing?"

A.      I think, literally, that's the case, but I think it was understood that I was at risk for some type of an arrest, at the very least. Even if the word arrest wasn't used by Mark Jantzen and then he said -- I mean, he directed -- my recollection is he directed John Thiesen to call the police if I appeared.

Q.      He told you that?

A.      That's what I overheard.

Q.      You overheard Dr. Jantzen tell Mr. Thiesen to call the police if he saw you?

A.      Yes.

(Exhibit A, pp. 191-196).

39.     Plaintiff did, in fact, return to Bethel College on the morning of March 17, 2018. (Exhibit A, p. 205).

40.     Plaintiff was met by Dr. Jonathan Gering, the president of Bethel College, at the entrance of the fine arts center. Dr. Gering told Plaintiff that he needed to leave and that he was not allowed to re-enter the conference. (Exhibit A, pp. 205-207; Exhibit L, Jonathan Gering Deposition, pp. 149-150, 156-158).

41.     Despite being told by Dr. Gering that he was not allowed to enter the conference, Plaintiff entered the fine arts center and the conference auditorium. (Exhibit L, 156-158).

42.     Dr. Gering called the police, consistent with his warning. (*Id*. at 86).

43.     Newton police officers, including Officer Don Stovall, arrived shortly after being called by Dr. Gering. (Exhibit M, Incident Narrative Report of Don Stovall).

44.     Officer Stovall met with Dr. Gering when he arrived. Dr. Gering told Officer Stovall that Plaintiff had been disruptive the day before and was asked to leave. (Exhibit N, Don Stovall Deposition, pp. 25-26).

45.     However, Dr. Gering did not tell Officer Stovall how Plaintiff was being disruptive. In fact, Officer Stovall testified:

Q.      So you show up on campus. Who did you talk to on campus?

A.      Dr. Gering.

Q.      Did you talk to anybody else besides Dr. Gering?

A.      There were a couple other people there but I don't know who they were. I didn't talk to them directly. They were just there by him.

Q.      Okay. But did you get any information from anybody other than Dr. Gering?

A.      No.

Q.      Did you talk with Plaintiff? Did you talk with Plaintiff at the time?

A.      Yeah, after I went down in the auditorium and got him but not before.

Q.      Yeah, I guess we are off on timing. So when you first arrived there on campus, the only person you talked to was Dr. Gering.

A.      Yes.

Q.      Can you describe to me the subject of that conversation? What did he tell you?

A.      Just that he had been there the day before and been disruptive and had been asked to leave and then that he had returned this morning and was down in the auditorium.

Q.      Did anybody explain to you how he was disruptive the day before?

10

A.      No.

Q.      Do you know if anybody explained to Officer Minkevitch how he was disruptive the day before?

A.      I don't know if -- no, I don't know.

Q.      As far as your assessment on whether or not arrest was warranted or whether a crime occurred, would it have mattered to you how he was disruptive the day before?

A.      No.

Q.      What specifically did matter to you?

A.      That he had been asked to leave and not come back.

(*Id*. at pp. 49-50).

46.     Officer Stovall arrested Plaintiff for trespass. (Exhibit M).

47.     Bethel College sent Plaintiff, by mail after he returned to California, a refund of his conference registration, which was $100. (Doc. 146, Stipulation No. 31).

48.     Plaintiff did not deposit the $100 check that was sent to him. (*Id*. at Stipulation No. 32).

49.     Since Plaintiff's arrest, the revenue generated by his law office has increased. (Exhibit O, Leichty Profit and Loss Statement).

## STATEMENT OF THE ISSUES

**I.**   **Is Bethel College entitled to judgment as a matter of law as to Plaintiff's false arrest claim?**

**II.**   **Is Bethel College entitled to judgment as a matter of law as to Plaintiff's breach of contract claim?**

## ARGUMENT AND AUTHORITIES

### Standard of Review

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the court applies this standard, it views the evidence and draws reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But the court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it." *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 864 F.3d 1154, 1173 (10th Cir. 2017). An issue of "material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of showing "the basis for its motion." *Celotex Corp.*, 477 U.S. at 323; *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation

and internal quotation marks omitted). To satisfy this requirement, the nonmoving party must

"go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex Corp.*, 477 U.S. at 324 (citation and internal quotation marks omitted).

When deciding whether the parties have shouldered their summary judgment burdens, "the

judge's function is not ... to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

    **I.**    **Bethel College is entitled to judgment as a matter of law as to Plaintiff's false arrest claim.**

Plaintiff was disruptive during the afternoon of March 16, 2018, when he asked for a

microphone during the question and answer portion of the last session. Prior to being given the

microphone, he was told by Dr. Jantzen, a conference and college representative, that he needed

to keep his comments on topic. Instead, Plaintiff chose to not follow this directive and he began

publicizing his event that was occurring that evening off campus. Later in the evening, Dr.

Jantzen told Plaintiff that he was not allowed to return to the conference: "[a]t the end [Bruce]

asked if he could come back tomorrow and I said no and that I would call the police again. He

said then he would have to be arrested." (Exhibit J).

Following this exchange, Plaintiff knew that he was told not to return, he knew that

conference representatives would contact the police, and he knew that college representatives

would consider him trespassing if he returned to the conference. Indeed, Plaintiff testified as

follows:

Q.    So your testimony is that without anybody telling you that you were, in fact, trespassing, you did have concerns that you might be trespassing?

A.    No, I didn't -- well, I didn't know the law. This is not one of my areas

13

> that I'd ever had to look into. My concern was that if -- because, I think, Mark Jantzen had told me the police would be called if I came back to the conference that then the next thing to happen might be that I would be charged with trespassing. And I didn't believe that I would be or I should be because I thought it was a civil matter, but I wanted to review the Kansas trespass statute to try to confirm what I believed to be the case.

> Q.   But nobody mentioned -- is it your testimony that nobody mentioned to you that you were in any danger of being arrested for "trespassing?"

> A.   I think, literally, that's the case, but I think it was understood that I was at risk for some type of an arrest, at the very least. Even if the word arrest wasn't used by Mark Jantzen and then he said -- I mean, he directed -- my recollection is he directed John Thiesen to call the police if I appeared.

> Q.   He told you that?

> A.   That's what I overheard.

> Q.   You overheard Dr. Jantzen tell Mr. Thiesen to call the police if he saw you?

> A.   Yes.

(Exhibit A, pp. 195-196). It is undisputed that Plaintiff was told, in unequivocal terms, that he was not allowed to return to the conference and that police would be called if he did return. He returned anyway, claiming ignorance of the law.

If that was not enough, when Plaintiff returned on the morning of March 17, 2018, Plaintiff was told again, by Dr. Gering, that he was not allowed to enter the conference. Instead of complying with the clear and unequivocal statement from the president of the college that he was not to enter or remain on the conference grounds, Plaintiff ignored these directives and made his way into the conference hall.

"False arrest is the restraint of the personal freedom of an individual without legal excuse by any words, acts, threats, or personal violence that under the circumstances the one being

restrained fears to disregard." *Soto v. City of Bonner Springs*, 38 Kan. App. 2d 382, 385, 166 P.3d 1056, 1059 (2007) (citing *Mendoza v. Reno Cty.*, 235 Kan. 692, 695, 681 P.2d 676 (1984)). Although the arrest does not have to be directly ordered by the defendant, "it must appear that they either instigated it, assisted in the arrest, or by some means directed, countenanced or encouraged it." *Thompson v. General Finance Co.,* 205 Kan. 76, 468 P.2d 269, 280 (1970). Instigating an arrest:

> …depends on the facts of each case. It is not necessary, to impose liability, that the defendant expressly direct the arrest. Nor need he be present when the arrest is actually made. However, he must take some active part in bringing the arrest about[,] that is, there must be some affirmative act on his part which induces the officer to make the arrest….

*Thurman v. Cundiff*, 2 Kan. App. 2d 406, 408, 580 P.2d 893, 897 (1978). The Kansas Supreme Court has held that a defendant cannot be liable for false arrest simply because it turned over to the authorities its knowledge of a suspected offense where an officer then makes an arrest on the officer's own judgment and discretion. *Thurman v. Cundiff,* 2 Kan. App. 2d 406, 580 P.2d 893, 898 (1978); *see also Wright v. Montgomery Ward & Co.*, 814 F. Supp. 986, 989 (D. Kan. 1993), *aff'd sub nom. Wright v. Montgomery Ward & Co.*, 25 F.3d 1059 (10th Cir. 1994) (citing *Thurman* for the proposition that conveying information to law enforcement cannot be a basis for defamation in Kansas). Accordingly, short of providing false information to police officers, a reporting party cannot be held liable for false arrest by simply contacting the police. *See Thurman*, 2 Kan. App. 2d at 409-10, 580 P.2d at 898.

Relying on *Thurman*, this Court held in *Wright* that a department store was not liable under Kansas law for the false arrest of a cashier based upon the store's loss prevention specialist's report of theft to police, even though the specialist's report contained inaccuracies. *Wright*, 814 F. Supp. 986. There, the plaintiff claimed that a loss prevention specialist for the

defendant reported that merchandise presented to the plaintiff for payment was not properly rung up. The police were called to the scene, the loss prevention employee's statement was taken, and subsequent theft charges were filed against the plaintiff. The court recognized that the defendant may have provided inaccurate information, but ultimately rejected the plaintiff's argument that defendant was liable under a theory of false arrest. In fact, almost every court that has addressed such an issue has held the same way as this Court did in *Wright*. *See Conn v. Paul Harris Stores, Inc.,* 439 N.E.2d 195, 199 (Ind. Ct. App. 1982) (relation of information to police insufficient to maintain action against third party for false imprisonment); *Johnson v. First Nat'l Bank and Trust Co. of Lincoln,* 300 N.W.2d 10, 13–14 (Neb.1980) (provision of information by employees to police not sufficient to maintain action against employer for false imprisonment and malicious prosecution); *Harrison v. Southland Corp.,* 544 S.W.2d 692, 694 (Tex. Ct. App. 1976); (mere reporting by employee of alleged offense does not establish employer's liability for false imprisonment); *Middleton v. Kroger Co.,* 38 Ill. App. 3d 295, 347 N.E.2d 27, 29 (1976) (store owner not liable for false arrest where employee merely asked sheriff's office to investigate matter); *see also Holland v. Lutz,* 194 Kan. 712, 719–21, 401 P.2d 1015, 1023 (1965) (person who merely signs complaint not liable for false arrest); *Thurman v. Cundiff,* 2 Kan. App. 2d 406, 410, 580 P.2d 893, 898 (1978) (merely giving information to officer not enough to render liable for false imprisonment).

The undisputed facts are clear. Bethel College did not provide false information to police officers. In fact, there is no evidence that Bethel College provided any information to police officers other than Plaintiff was disruptive on March 16, 2018, that he was told not to return to the conference, and that he returned nonetheless. (Exhibit N, pp. 49-50). Dr. Gering, who called the police on March 17, 2018, did not even tell police officers that Plaintiff was trespassing, but

instead just reported that Plaintiff had been told not to return. (Exhibit L, p. 151). Officer Stovall, the arresting officer, testified clearly that what mattered to him in making the arrest was that "[Plaintiff] had been asked to leave and not come back." (Exhibit N, p. 50). For this reason alone, Plaintiff's claim for false arrest must be dismissed.

Notwithstanding, the Kansas Supreme Court has also held that "a party may not be held liable for false arrest where legal cause or justification existed for the restraint." *Thurman*, 2 Kan. App. 2d at 411. Indeed, "the owner of property, in the exercise of his inherent right to protect it, is justified in restraining another who seeks to interfere with or injure it where the restraint is reasonable in time and manner." *Id*. With that in mind, criminal trespass is defined in Kansas as:

[E]ntering or remaining upon or in any:

(1)     Land, nonnavigable body of water, structure, vehicle, aircraft or watercraft by a person who knows such person is not authorized or privileged to do so, and:

(A)     Such person enters or remains therein in defiance of an order not to enter or to leave such premises or property personally communicated to such person by the owner thereof or other authorized person

K.S.A. 21-5808(a).

Again, Plaintiff was told, in no uncertain terms, that he was not to return to the conference grounds. Plaintiff was provided this directive on at least two occasions: (1) when he was told not to return to the conference by Dr. Jantzen on the evening of March 16, 2018, and (2) when he was told by Dr. Gering not to enter the conference on March 17, 2018. Plaintiff both knew that he was not authorized to enter or remain on the conference grounds. However, he remained in defiance of the multiple orders he received to leave.

Bethel College, as a private landowner, has the right to determine who is allowed to enter and remain on any part of its land. *Thurman*, 2 Kan. App. 2d 411. It exercised that right by informing Plaintiff that he was not allowed to enter or remain on the conference grounds.

Plaintiff, by entering and remaining, despite multiple warnings, was trespassing. Accordingly, even if false information was provided to police—which it was not—Bethel College cannot be liable for false arrest because the arrest was warranted. *See Thurman*, 2 Kan. App. 2d at 411. For these reasons, Plaintiff's claims for false arrest must be dismissed as a matter of law.

**II.      Bethel College is entitled to judgment as a matter of law as to Plaintiff's breach of contract claim.**

      **a.  Bethel College's obligations under the contract and/or license agreement was excused by Plaintiff's conduct.**

Plaintiff claims that by paying a $100 registration fee, he had a contract or a license with Bethel College to attend the conference. It is undisputed that "although a license is generally revocable at the will of the licensor, an executed license—a license supported by valuable consideration—may not be revoked." *Wichita State Univ. Intercollegiate Athletic Ass'n, Inc. v. Marrs*, 29 Kan. App. 2d 282, 285, 28 P.3d 401, 403 (2001). When a license is supported by consideration, it becomes a form of contract. *See id*.

The essential elements of breach of contract are "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083, 1098 (2013). To recover under breach of contract, a plaintiff must show that her or she performed under the terms of the contract or was willing to perform under the terms of the contract. *See id*. Derived from this basic tenant of contract law, Kansas courts have also held that if one party commits a prior breach, the non-breaching party is relieved of its obligations under the contract until the breach is cured. *See Bank of Am., N.A. v. Narula*, 46 Kan. App. 2d 142, 142, 261 P.3d 898, 902 (2011). Indeed, Kansas courts have noted that each party

"must perform the terms and conditions of that agreement before he or she can claim the benefits to be derived therefrom." *In re Estate of Johnson,* 202 Kan. 684, 692, 452 P.2d 286 (1969).

The contract, if any, between Plaintiff and Bethel College was an oral agreement. Indeed, there is no evidence of a written contract between the parties. Under Kansas law, an oral contract may be proven by the conduct and understanding of the parties when entering into the agreement. *Quaney v. Tobyne*, 236 Kan. 201, 210, 689 P.2d 844, 850 (1984); *see also Lindsey Masonry Co. v. Murray & Sons Constr. Co.*, 53 Kan. App. 2d 505, 517, 390 P.3d 56, 65 (2017) (course of conduct can be used to prove a contract).

Plaintiff knew that, "broadly speaking," Bethel College was free to run the conference as they saw fit. (Exhibit A, p. 172). Certainly, Plaintiff knew that all conference attendees were obligated to comply with the directives of conference and Bethel College officials. (*See* Exhibit A, pp.171-176). By his conduct at the conference, Plaintiff did not honor his obligations under his alleged oral contract with Bethel College.

Plaintiff was directed by Dr. Milliman to stop passing out fliers at the outset of the conference. By Plaintiff's own admission, he refused to comply until the police were called. (Exhibit G, pp. 35-44). Therefore, Plaintiff breached the alleged oral contract with Bethel College. Beyond that, Plaintiff was told, during the final session of the afternoon on March 16, 2018, that he was to keep his comments during the session "on topic." (Exhibit H, Mark Jantzen Deposition, pp. 141-142, Exhibit I, Video of Final Session on March 16, 2018). Unfortunately, Plaintiff did not keep his comments on topic, and made announcements regarding his planned event. (*See id.*). When Dr. Jantzen requested that Plaintiff stop talking, Plaintiff again refused the directive of a conference official by continuing to talk until police officers were called. (Exhibit

A, pp. 184-187; Exhibit H, pp. 141-142; Exhibit I). As such, Plaintiff again breached the alleged oral contract with Bethel College.

Bethel College was not required to allow Plaintiff to continue disrupting the conference, just because Plaintiff paid a $100 registration fee. Indeed, under Kansas law, Plaintiff's prior breach excused Bethel College of any continued obligations under the alleged oral contract. For this reason, Plaintiff's claim for breach of contract must be dismissed as a matter of law.

> **b.  Plaintiff cannot recover damages for "loss of freedom, personal humiliation and impairment to his reputation" or any other consequential damages under a claim for breach of contract.**

The damages alleged by Plaintiff for "loss of freedom, personal humiliation and impairment to his reputation" or any other consequential damages are speculative and not related to the alleged breach by Bethel College. In Kansas, lost profits and other consequential damages are recoverable only if they (1) were "contemplated at the time of contracting," (2) are the proximate result of the breach of contract, and (3) are "shown with a reasonable degree of certainty." *MLK, Inc. v. Univ. of Kansas*, 23 Kan. App. 2d 876, 885, 940 P.2d 1158, 1164 (1997). "Damages claimed which were not the proximate result of the breach of contract and those which are remote, contingent, and speculative in character cannot serve to support a judgment." *Id*.; *see also Sprint Nextel Corp. v. Middle Man, Inc.*, No. 12-2159-JTM, 2014 WL 6977931, at *4 (D. Kan. Dec. 9, 2014). The Kansas Supreme Court, in *Apperson v. Security State Bank,* 215 Kan. 724, Syl. ¶ 7, 528 P.2d 1211 (1974), stated that "damages claimed which were not the proximate result of the breach of contract and those which are remote, contingent and speculative in character cannot serve to support a judgment." In *Source Direct, Inc. v. Mantell,* 19 Kan. App. 2d 399, 409, 870 P.2d 686 (1994) the Kansas Court of Appeals stated that "reliance damages, as with any other type of damages, must be the proximate result of the breach of contract, and

damages which are remote, contingent, and speculative in character cannot serve to support a judgment."

Plaintiff claims damages for "loss of freedom, personal humiliation and impairment to his reputation" and other consequential damages (lost profits) under his claim for breach of contract. These claimed damages are both too remote and too speculative to be recovered. *First*, Plaintiff has not presented any evidence that he lost profits as a result of the alleged breach of contract. In fact, the only evidence Plaintiff has presented to support his claim for lost profits is a profit and loss statement for his business, which shows that his income has actually *increased* since the conference. (Exhibit O).

*Second*, none of the claimed damages for "loss of freedom, personal humiliation and impairment to his reputation" or any other consequential damages resulted from the alleged breach of contract. Even by Plaintiff's own admission, such alleged damages resulted from Plaintiff's claim that he was falsely arrested, claiming that "[t]he breach of contract in my opinion led inexorably to all the events that followed." (Exhibit A, p. 225). The damages resulting from the alleged false arrest, and not directly from the alleged breach of contract, are too "remote, contingent, and speculative in character" to be recoverable. *Mantell,* 19 Kan. App. 2d at 409.

*Finally*, Kansas does not allow exemplary or non-pecuniary damages for breach of contract. *Moffet v. Kansas City Fire & Marine Ins. Co.*, 173 Kan. 52, 57, 244 P.2d 228, 233 (1952) ("As a general rule, damages for breach of contract are limited to pecuniary loss sustained."). The rule in Kansas is well settled that "exemplary or punitive damages are not recoverable in actions for breach of contract in the absence of independent tort or wrong causing additional injury…." *Id*.; *see also Mabery v. W. Cas. & Sur. Co.*, 173 Kan. 586, 593, 250 P.2d

824, 830 (1952). If Plaintiff cannot recover under his claim for false arrest, he also cannot recover for non-pecuniary damages under his breach of contract claim. For these reasons, Plaintiff's claims for non-pecuniary damages under breach of contract should be dismissed as a matter of law.

## CONCLUSION

For the reasons stated here, Bethel is entitled to judgment as a matter of law as to Plaintiff's claim for false arrest and breach of contract. Additionally, Plaintiff's claims for non-pecuniary damages under his breach of contract claim should also be dismissed.

Respectfully submitted:

/s/ Corey M. Adams
Corey M. Adams, #27253
Scott E. Sanders, #18744
MCDONALD TINKER PA
300 W. Douglas, Suite 500
Wichita, KS 67202
T: (316) 263-5851   F: (316) 263-4677
cadams@mcdonaldtinker.com
ssanders@mcdonaldtinker.com
*Attorneys for Defendants Bethel College*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of August 2021, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic

filing to the following:

Bruce Leichty
220 W. Grand Ave.
Escondido, CA 92029
T:   760-484-2467
F:   951-676-7462
E:   leichty@sbcglobal.net
*Pro se Plaintiff*

/s/ Corey M. Adams_____
Corey M. Adams, #27253