IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRUCE LEICHTY,

        Plaintiff,

v.                                                            Case No. 19-1064-JWB

BETHEL COLLEGE,

        Defendant.

MEMORANDUM AND ORDER

This matter is before the court on Bethel College's ("Bethel's") motion for summary judgment (Doc. 148), Plaintiff's motion to strike (Doc. 160), and Bethel's motion to strike (Doc. 163).  For the reasons stated herein, the parties' motions to strike are DENIED, and Bethel's motion for summary judgment is GRANTED.

**I.  Plaintiff's motion to strike (Doc. 160).**

Plaintiff objects to consideration of several exhibits cited by Bethel in its summary judgment motion.  Plaintiff first objects to five deposition transcripts – Exhibits A, G, H, L, and N[1] – as being unauthenticated and constituting inadmissible hearsay "on their face."  (Doc. 160 at 1-2.)  Plaintiff further argues Exhibits G, H, and L are hearsay because they are depositions of Bethel's employees and "Defendant has not explained why [this] evidence … could not have been presented by affidavit or declaration."  (*Id.* at 2.)

The court rejects these objections.  Authentication means the proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R.

---

[1] The exhibits are attached to Doc. 149.  Exhibit A (Doc. 149-2) is Plaintiff's own deposition.

Evid. 901(a).  Bethel provides court reporter certificates to establish that the cited depositions are, as they purport to be, the transcribed testimony of the named witnesses.  As for Plaintiff's hearsay objections, a general assertion that entire deposition transcripts are inadmissible hearsay is not sufficient to show that any particular testimony is inadmissible.  Moreover, insofar as Plaintiff objects because testimony could have been presented by affidavit, there is no rule requiring the presentation of testimony in affidavit form rather than by deposition for purposes of summary judgment.  Rule 56 specifically contemplates that parties can establish facts by "citing to particular parts of materials in the record, including depositions …."  *See* Fed. R. Civ. P. 56(c)(1).

Plaintiff's additional objections are also unavailing. Plaintiff objects that evidence about his prior actions at Mennonite Church USA conventions are "either not relevant or more prejudicial than probative under Rule 401 and 403, and excludable under Rules 404-406…." (Doc. 160 at 2.)  He similarly contends evidence of a brochure he attempted to have published before the conference – something Bethel officials were aware of – is irrelevant, more prejudicial than probative, inadmissible hearsay, and lacking foundation.  (*Id.*)  Those objections are overruled, as the brochure was sent by Plaintiff, and such evidence is relevant to show Bethel's knowledge and whether it had grounds to exclude Plaintiff from its conference based on his attempts to promote a viewpoint with which Bethel disagreed.  Moreover, it is obvious that Bethel is not citing the brochure produced by Plaintiff in order to prove the truth of the matters asserted in it.  Plaintiff's objections and motion to strike these materials are denied.

## II.  Bethel's motion to strike (Doc. 163).

Bethel moves to strike Plaintiff's 33-page declaration (Doc. 157-1), which is attached to Plaintiff's summary judgment response, arguing it improperly attempts to circumvent the court's page limitations.  Whatever Plaintiff's purpose in submitting the declaration, the court agrees that

it contains extensive and improper argument as well as assertions not shown to be based on Plaintiff's personal knowledge. Nevertheless, the court declines to strike the declaration, as much of it is appropriately considered on summary judgment. Rather than attempt to sift through and excise the improper portions, the court simply includes in the statement of uncontroverted facts only those factual matters that are properly supported and material for purposes of summary judgment.[2] Bethel's motion to strike is accordingly denied.

### III. Uncontroverted Facts

Based on the materials submitted, the court finds the following facts to be uncontroverted for purposes of summary judgment. This statement does not include facts asserted by either party that are not properly supported by the materials cited or that are not shown to be based on personal knowledge of the witness.

In 2017, Mennonite Church USA ("MCUSA") held a national conference. One of the topics at the conference related to the Palestinian/Israeli conflict. Plaintiff attended and opposed a delegate resolution whose general tone, according to Plaintiff, was "that we need to repent for being anti-Semitic as a Mennonite Church." (Doc. 149-2 at 3.) Plaintiff did not believe there was any significant history of anti-Semitism in the American Mennonite Church. He took literature with him to hand out at the conference about "the influence of Israel in America" because he was convinced that "Mennonites, like many others, are insufficiently aware of the very powerful Israeli lobby and how it functions in the corridors of power in DC and, more generally, how that lobby and associated persons effect US economics, media, et cetera …." (*Id.*) At a conference workshop,

---

[2] As the court has noted previously, because Plaintiff is a licensed attorney he is not entitled to the benefit of the rule requiring the court to liberally construe filings of pro se litigants. (Doc. 63 at 11 n.4) (citing *Caranchini v. Hayden*, 2019 WL 2567734, *2 (D. Kan. June 21, 2019) ("The pro se liberality rule … does not extend to pro se plaintiffs who are licensed attorneys.") (citing *McNamara v. Brauchler*, 570 F. App'x 741, 743 (10th Cir. 2014)).

Plaintiff stood up and announced he was willing to give free copies of a book on Israel's influence in America to anyone who was interested.  Plaintiff had already been told by conference officials he should not be distributing a statement summarizing his opposition to the resolution on conference grounds, but he did not equate that prohibition with what he was doing at the workshop. Someone took exception and called the police.  Plaintiff was threatened with arrest by conference officials if he did not stop distributing the book.  Plaintiff pointed out he was a delegate and said he was entitled to be there, but a conference official said, "we're going to order you to leave the convention, and if you come back, you'll be arrested for trespass." (*Id.* at 4.)  Plaintiff was allowed to remain after he agreed to refrain from distributing the books on convention grounds.

Bethel College scheduled a conference titled "Mennonites and the Holocaust" for March 16-17, 2018.  The conference aimed "to document, publicize, and analyze Mennonite attitudes, environments, and interactions with others in Europe during the 1930s and 1940s that shaped their responses to and engagement with Nazi ideology and the events of the Holocaust."  (Doc. 149 at 2.)  Plaintiff timely pre-registered for the conference by submitting the information requested of him and paying a $100 registration fee.

Plaintiff planned to moderate an event he organized at a nearby community room in North Newton on the evening of March 16, 2018.  The main speakers were to be two individuals, both Jewish, whom Plaintiff knew to be extremely pro-Palestine regarding the Palestine/Israeli conflict. Plaintiff's concern, which he believed these two individuals shared, was that "the Holocaust was being exploited in modern day America … as a carte blanche, if you will, for all sorts of conduct by – whether it be Israel or Zionists or other elite Judaics [--] that they would trot out the anti-Semitism/Holocaust card whenever it was convenient."  (*Id.* at 11.)

Prior to the Bethel conference, Plaintiff contacted Paul Schrag, the editor and publisher of Mennonite World Review, an independent journalistic ministry in Kansas, and requested that he publish Plaintiff's classified advertisement about his event at the community room in the March 12, 2018 edition of Mennonite World Review.  Schrag rejected the ad.  Plaintiff then sent Schrag a pamphlet explaining "Holocaust revisionism" in an effort to change his mind, but Schrag still refused to publish the ad.  Schrag then emailed the organizers of the Bethel conference – John Sharp (Hesston College employee), John Thiesen (Bethel College employee), and Mark Jantzen (Bethel College employee) – informing them of Plaintiff's plan to hold an event and attaching the pamphlet.

Bethel officials discussed what to do if Plaintiff passed out literature at the conference. Lori Livengood, Bethel's Vice-President of Marketing and Communications, emailed Jantzen on March 13, 2018, conveying that the North Newton Police Department ("North Newton PD") informed her Plaintiff had reserved the community room and wondered if Jantzen would be okay "with [Plaintiff] handing out materials at the conference as their research has shown him to be a provocateur."  (Doc. 149-7 at 1-2.)  The PD "offered their assistance [if] you need to have him removed."  (*Id.* at 2.)  Jantzen replied that "[w]e know about his reputation and attitudes," and said Plaintiff did not have permission to hand out material on campus "and if there is a safe and legal way to prevent that we would want to pursue it."  (*Id.* at 1.)  Jantzen indicated he did not expect protesters at the convention, noting reports that Plaintiff's style was that "he says his piece and then lets it go," which "[w]e could live with …."  (*Id.*)  Jantzen indicated he wasn't sure what to do and solicited advice.  Livengood replied that North Newton PD said "we can tell him he does not have permission and if he persists in handing out materials then we can ask him to leave," and if "he chooses not to leave, then we can call them at 911."  (*Id.*)  She added that "their research

also indicates that he is typically non-violent but has had to be removed from other events." (Doc. 149-6 at 4.) In further emails, Jantzen indicated Livengood should ask North Newton PD to come to the conference opening session if they were willing to do so, preferably in plain clothes with no weapons. (*Id.* at 3.) He also conveyed "our current thinking" about asking that Plaintiff be removed if he is passing out literature at the registration or disrupting the proceedings. (*Id.* at 2.) After further discussions, Livengood emailed Jantzen on March 15, noting "we are in agreement that we would not permit him to distribute materials/literature" and the approach would be:

> 1. Request him to stop handing out materials.
>
> 2. If still handing out materials, or becoming vocal, inform him we respect his right to a different opinion and to voice that opinion but the appropriate place to protest is on the nearest public property near Kidron Cottege [sic]. If he chooses to not take his option to protest on public property we'll be contacting the local law agency to escort him off campus.
>
> 3. If he still continues, call 911 and ask for PD removal.

(*Id.* at 2.) In reply, Jantzen stated "[t]he planning committee conversation has evolved towards letting him distribute material if it is not obviously offensive," although "[i]f the college has a more restrictive approach that's fine." (*Id.* at 1.)

On March 16, the first day of the Bethel conference, Plaintiff brought with him the two speakers who were scheduled to speak at his own event. Neither of them had pre-registered for the Bethel conference and Jantzen denied Plaintiff's request that they be granted access to the conference. (Doc. 149 at 4.) According to Plaintiff, Jantzen indicated his decision might be revisited the following day. After Plaintiff checked in, he began passing out flyers about his event ("Two Revisionist Jews Consider the Holocaust") scheduled for that evening. Plaintiff was asked by Dr. Robert Milliman, Vice-President of Academic Affairs at Bethel College, to stop passing out the flyers. Plaintiff indicated that as a registrant he was entitled to hand out flyers, and he continued to hand them out. (Doc. 149-2 at 13.) Milliman told Plaintiff he would be kicked out

of the conference unless he complied.  Plaintiff stopped passing out the flyers only after Milliman called the police.  Once the police were called, Plaintiff returned the flyers to his vehicle and did not pass them out anymore. (Doc. 157-1 at 8-9.)

During a question-and-answer or comment period at the last seminar of the day, Plaintiff stood up to make a comment.  A microphone was brought to him.  Jantzen, who was seated near the front of room, told Plaintiff to "stay on topic."  (Doc. 149-2 at 16.) Plaintiff began by stating, "Just as there are different perspectives on the Holocaust among Mennonites, so also are there different perspectives among Jews."  (Doc. 157-1 at 10.)  At that point, Jantzen and session chair Dolores Yoder Harms directed that the microphone be cut.  (*Id.*)  Plaintiff states that Jantzen "raced up the aisle to where I was standing and I was asked to return the microphone…." (*Id.*)  Plaintiff states that "I was not able to complete my comments about the 'Two Revisionist Jews Consider' event because of the disruption caused by the visible anger and actions and … statements of Mark Jantzen." (*Id.*)  Jantzen stated, "Are you going to leave or am I going to call the police?"  (*Id.* at 28.) Plaintiff added a few more sentences without the benefit of the microphone, stating that there was a 6 p.m. meeting at the North Newton City Hall featuring revisionist Jewish perspectives on the Holocaust, "although disruptive registrants were trying to drown me out."  (Doc. 157-1 at 10, 26.)  Jantzen threatened to contact the police if Plaintiff did not stop speaking.  (Doc. 149 at 5.) Plaintiff did not stop speaking until after Jantzen called the police.  (*Id.* at 6.)  At some point, session moderator Harms said (into her microphone) "I suggest you leave," which Plaintiff allegedly believed at the time was directed to the registrants in general ("some of whom had become unruly in their catcalls"), although he now realizes the remark may have been directed at him.  Plaintiff believed this formally ended the session, so he left.  (Doc. 157-1 at 10-11.)  When

Newton police officers arrived and asked if Bethel wanted to press charges for trespassing, Jantzen told them he just wanted to "let it go."  (Doc. 149 at 6.)

Plaintiff left the building with John Sharp, one of the other conference organizers.  Sharp asked if there was some other forum in which Plaintiff could express himself.  Sharp invited Plaintiff to have lunch and talk the following day, and the two agreed they would meet the next day at the conference-provided lunch.  (Doc. 157-1 at 11.)  As Plaintiff was leaving the parking lot in his car, he saw North Newton PD Chief Randy Jordon, and the two talked through the open windows of their cars.  Plaintiff said he was on his way to the North Newton Community Room (which was adjacent to PD headquarters), and the two agreed to talk there.  (*Id.*)

That evening, Plaintiff attended a session at Bethel which was open to the public and which consisted of a film.  After the film was over, Plaintiff approached Jantzen and asked if his two guests would be allowed to attend the conference the following day.  Jantzen replied, "Not only are they not going to be permitted to register, you're out of the conference too."  (Doc. 157-1 at 12.)  Plaintiff protested that this was unfair to the two individuals who had traveled a great distance to the conference, and further stated that he "was still a registrant and thus had a right to be present at the entire Conference."  (*Id.*)  As the conversation ended, Jantzen "was obviously implying to me [Plaintiff] that I could be arrested if I returned."  (*Id.*)  Plaintiff heard Jantzen "say in a loud voice to another conference organizer (John Thiesen), as Jantzen walked out at the same time [Plaintiff] did, 'call the police if you see him here tomorrow' or words to that effect."  (*Id.*)

Jantzen emailed Gering, Livengood, Milliman, Sharp and Thiesen and others at 9:52 p.m. that evening, informing them he had told Plaintiff after the film that he could not come back tomorrow and that the police would be called again if he did, but that [according to Jantzen]

Plaintiff indicated he would have to be arrested.[3]   Jantzen asked the others if they would be available to help the following day between 8 and 9 a.m. and asked for advice about trespassing charges.  (Doc. 149 at 6).   Several individuals responded that they would be there.  Livengood's response included her understanding that the Kansas trespassing statute "give[s] the owner of the land the right to press charges if it has been communicated to the individual, even if only verbally, not to enter the land or structure and the person does so."  (Doc. 149-11 at 2.)

   Although Plaintiff did not believe he could be arrested for trespassing – because he had registered and paid to attend the conference – Plaintiff believed Jantzen's words "had been ominous," and so Plaintiff did some online research on Kansas trespassing law.   Early on the morning of March 17, Plaintiff went to the North Newton PD headquarters and spoke with the officer on duty, Don Stovall.  (Doc. 157-1 at 14.) Plaintiff told Stovall that he was attending a conference at the nearby college, for which he had registered, and that a conference organizer had said he was "out" of the conference.  (*Id.* at 17.) Plaintiff expressed concerned that Bethel would call the police again and try to have him arrested "simply for being present."  (*Id.*)   Stovall told Plaintiff that he would not be arrested unless he was told in the presence of police not to return to campus and he then refused.  (*Id.*)

   Plaintiff returned to Bethel on the morning of March 17, 2018.  He was met by Gering, the president of the college.  Gering told Plaintiff he was not allowed to enter the conference. (Doc. 149 at 9.)  Plaintiff replied that he remained a registrant and added that he had been invited by Sharp to be present that day.  (Doc. 157-1 at 14.)  According to Plaintiff, Gering "referred to a Kansas statute which I did not know, and I told him I had done a little on-line research on trespass."  (*Id.*)  According to Plaintiff, Gering "threatened that he 'was going to' ask me to leave the property

---

[3] In Plaintiff's phrasing, he explained to Jantzen "why I could not lawfully be arrested, namely that I remained a paid registrant."  (Doc. 157-1 at 13.)

and give me a trespass warning, which I did not take as an order…." (*Id.*)  Although Gering "tried to bar [Plaintiff] from entering the auditorium," Plaintiff proceeded to enter the conference auditorium.  (*Id.* at 19.)  According to Plaintiff, after Gering "was unsuccessful in persuading me that I no longer had the rights of a registrant and that I should leave voluntarily," Plaintiff entered the auditorium, and although he knew the police might be called, he believed he "would be told to leave and given the opportunity to leave voluntarily at the point where police arrived, which I intended to do."  (Doc. 157-1 at 19.)  Gering called the police.

North Newton PD Officers Don Stovall and Levi Minkevitch arrived a short time later. Gering told Stovall Plaintiff had been disruptive the day before and had been asked to leave and not come back, and that he had returned this morning and was down in the auditorium.  (Doc. 149 at 10; Doc. 149-15 at 2, 5.)  Stovall and Jantzen approached Plaintiff in the auditorium; Jantzen asked Plaintiff to come with him.  Plaintiff stood up and followed Jantzen, saying to the other registrants that "fascism has come to Bethel College" and that he was a duly registered attendee entitled to be there but the college claimed otherwise.  (Doc. 157-1 at 20.)

In the foyer outside the auditorium, Stovall accused Plaintiff of having not given him all the facts in their previous discussion, saying Plaintiff had not told him he was told to leave (or "trespassed") the prior day.  (*Id.*)  Plaintiff said that was not true.  Plaintiff told Stovall there was "a distinction between being told I was 'out' of a conference where I was a paid registrant and being told I was in trespass on a campus and being instructed to leave the campus and not return, and I told him that the latter had not occurred."  (*Id.* at 21.)  Plaintiff asserted he had not been given a warning and that he believed "what was at issue was [a] civil dispute about my rights as a registrant, about 'my authorization to be here.'"  (*Id.*)  Officer Minkevitch replied that his right to attend the conference could be revoked at any time.  (*Id.*)  Plaintiff said that was not correct, telling

Minkevitch "that I knew that because I was a lawyer." (*Id.*) Minkevitch offered the analogy of Plaintiff receiving a ticket to enter Minkevitch's house, which Minkevitch could revoke at any time. When Plaintiff "tried to explain further by saying 'it's not that simple,' he cut me off by stating 'it is that simple,' and he stated 'we're not debating,' and that 'you're going to be arrested today.'" (*Id.*) Plaintiff repeated that his right to be at the conference was never revoked and that he had been invited to lunch at the conference by Sharp. Stovall placed Plaintiff under arrest for trespass. Gering and Milliman were standing within earshot; they did not say or do anything as Stovall arrested Plaintiff.

After Plaintiff returned to his home in California, Bethel College sent him a refund of his $100 conference registration. Plaintiff did not deposit the check. (Doc. 149 at 11.)

## IV. Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quotation marks omitted).

The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If the moving party meets

its burden, the nonmoving party "must do more than refer to allegations of counsel contained in a brief to withstand summary judgment. Rather, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quotation marks omitted). *See Redd v. City of Oklahoma City*, No. 20-6145, 2021 WL 3909982, at *3 (10th Cir. Sept. 1, 2021). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views the evidence and all reasonable inferences therefore in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## V. Analysis

A. <u>False arrest</u>.  Bethel contends it is entitled to summary judgment on Plaintiff's claim of false arrest because it did not provide materially false information to Stovall, the arresting officer, and because there was a legal justification for Plaintiff's arrest based on probable cause that he committed the offense of trespass.  (Doc. 149 at 16-19.)  In response, Plaintiff argues summary judgment is not warranted, among other reasons, because Gering falsely told Stovall that Gering "had personally warned Plaintiff the prior day [March 16] to leave and not return," such that there is a triable issue of fact as to whether Bethel wrongfully instigated his arrest.  (Doc. 157 at 11.[4]) Plaintiff makes a host of other arguments as well in opposition to summary judgment.

To recover for false arrest under Kansas law, a plaintiff must show that he "was unlawfully caused to be arrested by the defendants, and, though it is not necessary that the arrest was directly ordered by the defendants, it must appear that they either instigated it, assisted in the arrest, or by some means directed, countenanced or encouraged it." *Douglass v. Garden City Cmty. Coll.*, No.

---

[4] For purposes of summary judgment, the court assumes the truth of Stovall's recollection that Goering informed him that he (Gering) had told Plaintiff on March 16 to leave and not come back.  (Doc. 149-15 at 3.)

12

CV 20-2076-KHV, 2021 WL 2338247, at *5 (D. Kan. June 8, 2021) (quoting *Thompson v. General Finance Co., Inc.*, 205 Kan. 76, 87–88, 468 P.2d 269, 280 (1970) (citing *Hammargren v. Montgomery Ward & Co.*, 172 Kan. 484, 241 P.2d 1192 (1952)).   In its prior order rejecting Bethel's motion to dismiss this claim on the pleadings, the court noted that the Kansas Court of Appeals had elaborated on the sort of "instigation" that gives rise to liability:

> What is direction or instigation sufficient to impose liability on a private citizen for a wrongful arrest made by an officer, within the rule imposing liability on a citizen at whose request or instigation an arrest is made without a warrant, depends on the facts of each case. It is not necessary, to impose liability, that the defendant expressly direct the arrest. Nor need he be present when the arrest is actually made. However, he must take some active part in bringing the arrest about[,] that is, there must be some affirmative act on his part which induces the officer to make the arrest....

*Thurman v. Cundiff*, 2 Kan. App. 2d 406, 408, 580 P.2d 893, 897 (1978) (quoting 32 Am. Jur.2d False Imprisonment § 35). The mere giving of information to an officer tending to show that a crime has been committed is not enough to render the informer liable. *Id.* Thus, a person is not liable "where he merely states to a police officer his knowledge of a supposed offense and the officer makes the arrest entirely upon his own judgment and discretion." *Id.* (citation omitted.) *See also Restatement (Second) of Torts* § 45A cmt. a ("It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.")

Kansas law makes criminal trespass a misdemeanor offense.  A trespass includes "entering or remaining upon or in any … (1) Land … [or] structure … by a person who knows such person is not authorized or privileged to do so, and … (A) Such person enters or remains therein in defiance of an order not to enter or to leave such premises or property personally communicated

to such person by the owner thereof or other authorized person…."  K.S.A. 21-5808 (Westlaw 2021).

Plaintiff contends Gering instigated a false arrest by falsely telling Officer Stovall that he (Gering) had personally told Plaintiff on March 16 to leave and not come back, when in fact "Plaintiff had no encounter with Gering [on] March 16."  (Doc. 157 at 14.)  But Plaintiff cites no evidence that Stovall's decision to arrest Plaintiff turned upon which particular Bethel representative – Gering or Jantzen – warned Plaintiff on March 16 against returning to the conference.  On the contrary, when Stovall was asked what specifically mattered to him in determining whether an arrest was warranted, he said it was the fact "[t]hat he [Plaintiff] had been asked to leave and not come back."  (Doc. 149-15 at 5.)  Thus, the material question as far as Stovall was concerned was whether Plaintiff had been warned not to come back, not which particular Bethel representative warned him.  And the uncontroverted facts show beyond reasonable dispute that Jantzen conveyed to Plaintiff on March 16 that he no longer had permission to be at the conference and that he would be arrested if he came back the following day.  Jantzen told Plaintiff that not only would his two guests not be allowed in, but Plaintiff was "out of the conference too," and when Plaintiff continued to argue, Jantzen said in a loud voice to another conference organizer, in Plaintiff's presence, "call the police if you see him here tomorrow." (Doc. 157-1 at 12.)  Plaintiff concedes Jantzen "was obviously implying to me that I could be arrested if I returned."  (*Id.*)  In fact, the only reasonable interpretation of these statements is that Jantzen was informing Plaintiff that his permission to be at the conference was revoked and warning him he would be treated as a trespasser if he returned the next day.

Plaintiff seems to place significance on the fact that Jantzen never used the word "trespass" and never specifically ordered him to "not come back."  But the statements made, and the

circumstances under which they were made, objectively show Plaintiff was being "asked to leave and not come back" – which is precisely what Stovall considered important in deciding whether an arrest was warranted.[5]  *See Restatement (Second) of Torts*, § 171 ("Subject to the privileges of reasonable egress and removal of things, the actor's privilege to enter land created by consent of the possessor thereof is terminated by … a revocation of the possessor's consent, of which the actor knows or has reason to know ….") and *id.* comment (e) ("A consent is terminated when the actor knows or has reason to know that the possessor is no longer willing that the actor shall enter or remain on the land.  A consent is so terminated when the actor knows that the possessor has done an act which is necessarily inconsistent with a continuance of the consent.")  It should be noted that whether or not the information Gering gave Stovall was incomplete or inaccurate in some respect is not sufficient, in itself, to create a material issue of fact on the claim of false arrest.  Because Plaintiff has not cited evidence that Gering misrepresented the material fact that Bethel gave a prior warning to Stovall, and has not cited evidence that Bethel otherwise improperly instigated his arrest, the uncontroverted facts will not support a claim against Bethel for false arrest.  The uncontroverted facts show that Plaintiff's permission to be at the conference was revoked and he was warned not to come back the next day; he simply did not believe Bethel had the right to revoke his permission to be at the conference.  *Cf.* C.J.S. Licenses at § 165 ("Even though the revocation of a license may constitute a breach of contract, it may nonetheless be effective to deprive the licensee of all justification for entering or remaining upon the land.")

Plaintiff makes a number of arguments why there is a triable issue of fact on the false arrest claim, none of which the court finds persuasive.  For example, Plaintiff asserts that "the intent of

---

[5] At his deposition, Plaintiff was asked his understanding of the comments Jantzen made to him and whether it was Plaintiff's understanding that "you were not allowed to return back to the conference."  (Doc. 165-2 at 2.)  Plaintiff responded, "My understanding is that he was trying to prevent me from being able to exercise my rights as a lawful registrant, yes."  (*Id.*)

Bethel College was to expel Plaintiff only from the academic conference and *not its campus or grounds or property*." (Doc. 157 at 9.)  Plaintiff seems to believe no trespass could occur because Bethel only warned him to stay off the portion of its property where the conference was being held, as opposed to the remainder of the Bethel campus.[6]  But Plaintiff cites no authority for this proposition and it has no basis in Kansas law.  *Cf. City of Wichita v. Bannon,* 42 Kan.App.2d 196, 209 P.3d 207 (2009) (person can be convicted of trespass for entering particular area of business owner's premises reserved for others); *Restatement (Second) of Torts,* § 169 ("A consent given by a possessor of land to the actor's presence on a part of the land does not create a privilege to enter or remain on any other part.")  In fact, Stovall testified that if Plaintiff had only been warned not to come back "to the conference" – as opposed to "the campus" – it would have made no difference in his decision to arrest Plaintiff.  (Doc. 157-2 at 83.)  Stovall further indicated it didn't matter to him whether Gering asked Plaintiff to leave on March 16 or March 17; in either event, if Plaintiff came back or remained after being asked to leave, Stovall said, he would have been arrested for trespass.  (*Id.* at 83-84.)

Plaintiff also claims the circumstances undermine any assertion that he knew he was not authorized to be on the conference premises at the time of his arrest.  He cites evidence that he was invited to lunch by Sharp, that he had registered and paid for the conference, and claims he was not told to leave "by a person who he could know had clear authorization to control his presence on the campus…."  (Doc. 157 at 18.)  But for purposes of determining whether Plaintiff's arrest was lawful, none of these circumstances precludes summary judgment.[7]  Contrary to Plaintiff's

---

[6] *See* Doc. 146 at 7 ("At no time did Jantzen or any other Bethel representative or Conference organizer tell Plaintiff at any time on March 16 that Plaintiff was ordered or had been ordered not to return to the campus, as distinct from the Conference.  At no time on March 16 did Jantzen or any other Bethel representative or Conference organizer use the word 'trespass' in speaking with Plaintiff.")

[7] With respect to the lunch invitation, Bethel had reasonable grounds to believe it did not grant Plaintiff the right to be in the auditorium for a morning conference session, both because that session obviously was not a lunch gathering and because Jantzen's revocation ("you're out of the conference") came subsequent to the lunch invitation.  Moreover,

suggestion, the lawfulness of the arrest does not turn on whether the State could ultimately prove guilt for the offense of trespass beyond a reasonable doubt.  It depends only on whether Stovall had probable cause to believe an offense had been committed.  "Probable cause exists if the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed." *State v. Abu-Isba,* 235 Kan. 851, 853-54, 685 P.2d 856 (1984).  *See also id.* (probable cause "is the reasonable ground for belief" that a specific crime has been committed by the defendant; it "does not require specific evidence of each element of the offense as would be needed to support a conviction.")  The uncontroverted facts show that on March 16 Bethel informed Plaintiff in a manner sufficient to put a reasonable person on notice that he did have Bethel's consent to be on the conference premises and that he was directed not to return.  Those facts, which were essentially provided to Stovall by Gering, gave Stovall probable cause to believe Plaintiff had committed a trespass by returning to the conference on March 17.  Plaintiff obviously believed Bethel's efforts to revoke his permission were not legally effective or were otherwise insufficient to support a trespass conviction.  But even assuming Plaintiff was correct, the uncontroverted facts show Stovall had reasonable grounds to believe Plaintiff had committed the offense.  They further show that Gering did not materially

---

Plaintiff says he informed Stovall of the lunch invitation, and it obviously did not affect Stovall's decision to arrest Plaintiff.  As for the fact that Plaintiff had registered and paid for the conference, Bethel again could reasonably believe that as a landowner, it retained the right to revoke permission to be on its property at any time, even if doing so might conceivably give rise to a claim for reimbursement. *See e.g., Baker v. Hayden*, 459 P.3d 834 (Kan. Ct. App. 2020), *review denied* (Apr. 23, 2021) ("a person who remains on another's premises after an invitation or license has been revoked becomes a trespasser. *See Riddle Quarries, Inc. v. Thompson*, 177 Kan. 307, 311, 279 P.2d 266 (1955)").  Finally, Plaintiff's contention that he could not know Jantzen had authority to revoke his permission to be at the conference is, at most, a factual dispute that does not vitiate the officer's probable cause to make an arrest.  The court notes Plaintiff does not dispute that he knew Jantzen was a conference organizer employed at Bethel.  Moreover, the uncontroverted facts show Plaintiff appealed to Jantzen to grant access to the conference for Plaintiff's friends, which indicates Plaintiff believed Jantzen had such authority.

misrepresent the facts to Stovall.  In sum, Plaintiff has failed to cite evidence from which a reasonable jury could find that his arrest was unlawful or that Bethel is liable for improperly instigating a false arrest.

B. <u>Breach of contract</u>. Plaintiff contends that Bethel, by preventing him from attending the entire conference, "breached the contract that it entered into with Plaintiff at the time it accepted Plaintiff's registration fee and provided him a conference badge and materials signifying his right to attend all conference sessions over a two-day period March 16 and 17."  (Doc. 146 at 12.) Plaintiff apparently contends this right was implied, as he cites no express or oral contract language granting such a right.  Bethel argues it is entitled to summary judgment on the claim because Plaintiff's conduct at the conference excused any obligation Bethel had to grant Plaintiff continued access to the conference premises. (Doc. 149 at 20.)  Bethel further argues Plaintiff cannot recover any of the consequential damages he seeks for the alleged breach, including damages for loss of freedom, personal humiliation, lost profits, and impairment to his reputation.   (*Id.* at 21.)

Plaintiff's asserted right to be on Bethel's premises to attend the conference is considered a license under Kansas law.  "A license in real property is the permission or authority to engage in a particular act or series of acts upon the land of another without possessing an interest therein." 25 Am. Jur. 2d *Easements and Licenses* § 105.  The possession of a license "justifies the doing of acts which would otherwise or normally be a trespass." *Id.* at § 107.  In general, however, a license "is revocable at the will or the pleasure" of the licensor and "ordinarily may be revoked without notice…." *Id.* § 110.  *See Gilman v. Blocks*, 44 Kan. App. 2d 163, 171, 235 P.3d 503, 510 (2010) ("On the other hand, a license is a personal privilege to do some act or series of acts upon the land of another without possessing any estate in the land. A license may be created by parol and is generally revocable at the will of the owner of the land in which it is to be enjoyed …." (citation

omitted)).   Although a "bare" or gratuitous license is generally revocable at will, most states, including Kansas, recognize that the giving of valuable consideration in exchange for or in reliance upon a license can limit the right of revocation. *See Page v. Lydic*, 123 Kan. 122, 254 P. 316, 317 (1927) ("where the licensee has acted under the license in good faith, and has incurred expense in the execution of it, by making valuable improvements or otherwise, it is regarded in equity as an executed contract and substantially an easement, the revocation of which would be a fraud on the licensee, and therefore the licensor is estopped from revoking it.")  *See also Stanolind Pipe Line Co. v. Ellis*, 142 Kan. 102, 45 P.2d 846, 848 (1935) ("If it be assumed that only licenses were granted, we must still take note of the fact that for a valuable consideration the grantee laid its lines and made its improvements. Even had this been done under an oral arrangement, it would not have been revocable at the pleasure of [the landowners]….")

The equitable nature of this limitation is apparent from *Page* and other cases, which examine factors such as whether the licensee has acted under the license "in good faith" and whether the revocation "would be a fraud" on the licensee.  *See also Smyre v. Bd. of Comm'rs of Kiowa Cty.*, 89 Kan. 664, 132 P. 209, 210 (1913) ("Many additional authorities might be cited in support of the doctrine that, when a license has been so far executed that a revocation of it would be a fraud upon the rights of the licensee, an equitable right will arise capable of being transferred to third persons and binding on all parties who claim through or under the licensor, with notice."); *Kastner v. Benz*, 67 Kan. 486, 73 P. 67, 67 (1903) ("Cases can readily be imagined where the revocation of a license, in reliance upon which the licensee has changed his own situation, might work the gravest fraud, injustice, and injury; and, under the plaintiff's theory of the facts in the present case, the denial by the defendant or plaintiff's right to use the stairway after the latter had consented to the extension of the party wall upon his land, and altered his own building to conform

to the new arrangement, is unconscionable. We hold that, accepting plaintiff's evidence as true, defendant is estopped to revoke the license.")   In the absence of any specific contract term governing revocation, then, a license issued in exchange for consideration may be revoked under Kansas law only to the extent doing so is consistent with the equitable test outlined in *Page*. Where revocation would work a fraud on the licensee, equity may be invoked to prevent revocation or, if revocation has already occurred, to require compensation be paid to the licensee.  *See* 25 Am. Jur. 2d *Easements and Licenses* § 110 ("If the licensor actively agrees to an expenditure being made by the licensee sufficient to cause a revocation of the license to work a fraud on the licensee, equitable principles demand that the license becomes irrevocable.  … Alternatively, the licensor may be required to compensate the licensee for his or her expenditures upon revocation of the license."); *Restatement (Second) of Torts* § 171 (1965) (Although an actor's privilege to enter land is terminated by a revocation of the possessor's consent, "[t]here may also be cases in which an estoppel arises against the licensor … or the situation arising is otherwise so inequitable and unfair to the licensee that the licensor … will not be permitted to terminate the license without adequate notice to the licensee, and an opportunity afforded to him to protect his interests. Nothing in this Section is intended to prevent a court from reaching such a conclusion in a proper case.")

It is reasonable to infer that Bethel's acceptance of Plaintiff's conference fee implied both Bethel's permission for Plaintiff to attend the conference and a concomitant license in Plaintiff to attend.  *See* 75 Am. Jur. 2d *Trespass* § 76 ("Consent or permission may … be implied when the owner's conduct would warrant a reasonable person to believe that the owner had given consent to enter the premises….")  But Plaintiff points to no evidence of an implied license or contractual right going beyond attending the conference sessions, and specifically nothing to support an implied right on his part to use the Bethel conference premises to promote his own event – an event

20

that Bethel conference organizers and officials obviously considered offensive and contrary to the purposes of their own conference. *See id*. at § 77 ("The acts of the party accused of trespass must not exceed, nor conflict with, the purposes for which the consent was given."). Yet when he was told by a Bethel representative on the conference premises to stop distributing the materials, Plaintiff insisted he had a right to do so and continued distributing them, even after the representative warned that Plaintiff would be kicked out of the conference if he did not stop. Plaintiff only stopped after the representative called the police. Similarly, Plaintiff attempted to use a conference session to inform the Bethel audience about his own event relating to an "alternative" view of the Holocaust. When Bethel conference representatives cut his microphone and told him to stop speaking, Plaintiff continued to speak about his event, ignored warnings that the police would be called, and ceased only after Bethel officials proceeded to call the police. Later that evening, Jantzen made clear to Plaintiff that Bethel was revoking its permission for him to attend conference sessions and warned him the police would be called if he came back. Plaintiff nevertheless returned the next day, ignored the directive of a Bethel representative, and entered the conference auditorium. Insofar as Plaintiff asserts that Bethel had no right to prevent him from engaging in such conduct on conference premises, Plaintiff is mistaken. *See Riddle Quarries v. Thompson*, 177 Kan. 307, 311, 279 P.2d 266, 270 (1955) ("A licensee who exceeds the permission given him becomes a trespasser and is only entitled to the observance of that duty on the part of the owner or occupant which he owes to any other trespasser.")

None of this bespeaks good faith use of the license by Plaintiff. Plaintiff was of course entitled to stage his own event and conduct it in any way he saw fit. But Bethel had a similar right – Plaintiff's views to the contrary notwithstanding – and the mere fact Bethel gave Plaintiff a license to attend its conference did not confer a right on Plaintiff to use the Bethel conference

premises to promote his own event.  *See* 53 C.J.S. Licenses § 149 ("A license to enter the premises for one purpose cannot support … entry for a purpose other than that for which the license was granted.")  As noted, a license is the permission or authority "to engage in a particular act or series of acts" upon the land of another; it is not a transfer or lease of the premises that confers a right to use the property as the grantee sees fit.  25 Am. Jur. 2d *Easements and Licenses* § 105.  Plaintiff cites no evidence that his license extended beyond attending the conference.  Plaintiff's conduct deviated from that purpose, and Bethel retained the right to demand that Plaintiff cease such conduct.

Under the uncontroverted facts, Plaintiff is entitled to no relief on his claim for breach of contract.  Good faith is not compatible with Plaintiff's continued promotion of his separate event after Bethel repeatedly asked him to stop.  Nor was Plaintiff's apparent game of cat-and-mouse consistent with good faith, given that he refused repeated requests to stop his promotion up until the point that Bethel followed through on threats to call the police, with Plaintiff apparently believing he could ignore the requests so long as he ceased his offending conduct before police arrived.  Nor do the uncontroverted facts show that revocation of the license by Bethel would work a fraud upon Plaintiff.  Any belief Plaintiff had about his right to use the Bethel conference premises to promote his own event resulted from his own beliefs, not from any misrepresentation by Bethel.  Nor is the court persuaded by Plaintiff's complaint that the revocation was unfair because Bethel did not publish rules ahead of time prohibiting his conduct.  Even assuming a reasonable person would not have realized that promotion of a separate event about a "revisionist" view of the Holocaust would not be permitted at the Bethel conference, the uncontroverted facts show Bethel notified Plaintiff it would not permit his conduct on conference premises – specifically informing him at least once that he would be kicked out of the conference if he did not

stop – and then gave him the opportunity to cease his conduct before it took action against him. Having twice ignored Bethel's requests, Plaintiff was not lacking in notice that his conduct could result in revocation of his license to attend the conference.  In these circumstances, the most that equity could require is the reimbursement of Plaintiff's conference attendance fee – something Bethel has already offered.  To date, however, Plaintiff has declined to accept that reimbursement. Under the uncontroverted facts, equity requires no more, such that Bethel has no further obligation to compensate Plaintiff.

### VI.  Conclusion

Plaintiff's motion to strike (Doc. 160) and Bethel's motion to strike (Doc. 163) are DENIED.  Bethel's motion for summary judgment (Doc. 148) is GRANTED; Plaintiff's claims against Bethel are dismissed on the merits.  The clerk is directed to enter judgment accordingly. IT IS SO ORDERED this day of February, 2022.

s/John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE